# CHAVES v. UNITED STATES.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 4. Argued October 12, 1897. — Decided November 15, 1897.

By the Spanish law in force at the time of the alleged grant of 1788, set up in this case, lots and lands were distributed to those who were intending to settle, and it was provided that, " when said settlers shall have lived and labored in said settlements during the space of four years, they are hereby empowered, from the expiration of said term, to sell the same, and freely to dispose of them, at their will, as their own property," but confirmation after the four years had elapsed was required in completion of the legal title; and it was further provided that it should " not be lawful to give or distribute lands in a settlement to such persons as already possess some in another settlement, unless they shall leave their former residence, and remove themselves to the new place to be settled, except where they shall have resided in the first settlement during the four years necessary to entitle them to fee-simple right, or unless they shall relinquish their title to the same for not having fulfilled their obligation." On the facts in this case it is *Held*, that the granting papers in this record, taken together, do not justify the presumption of settlement and working by the two Garcia's on the tract contained in the grant of 1788, for the ten years prior to 1798, or for four years thereof, or any confirmation of the grant thereupon, but that the contrary is to be inferred from the testimony in respect of possession; that Armenta's

certificate of 1798 and the correspondence of 1808 conduct to no other result; and that, in the light of all the evidence, the conclusion of the court below was correct.

THIS was a petition filed by heirs and legal representatives of Francisco Garcia de Noriega and José Antonio Garcia de Noriega, for the confirmation of an alleged grant made by Governor Concha, January 27, 1788, of 9752.57 acres, called the Cañon de San Diego, situated in the county of Bernallilo, New Mexico, and included within a grant of 116,288.89 acres by Governor Chacon, March 6, 1798, alleged in the petition to have been to the "town of the Cañon de San Diego."

The granting papers of 1788 were produced and placed in the archives of the Government by claimants in 1879. As translated by the Government, they read as follows:

"Señor Governor DON FERNANDO DE LA CONCHA:

"We, Francisco Garcia de Noriega, interpreter for the Navajos, and José Antonio Garcia de Noriega, with the most profound respect appear before your Excellency and state, Sir, that a *cañon* which is called San Diego being found vacant, having seen that cultivation may be had and some animals pastured therein, we prostrate ourselves at the royal feet of your Excellency's grandeur solely to ask and pray that you deign in the name of his Majesty to favor us by giving us the said *cañon* for the purposes mentioned, on account of finding ourselves lacking land for planting, and, we deserving that his Majesty should favor us, we ask as a grant the said *cañon;* on account of all which we ask and pray that your Excellency be well pleased to command that what we request be done, that by your so doing we shall receive great benefit and favor, etc.

"FRANCISCO GARCIA DE NORIEGA.      (Scroll.)
"JOSE ANTONIO GARCIA.      (Scroll.)

"SANTA FE, *January* 27, 1788.

"I grant, in the name of the King, the cultivation and working of the land which the petitioners ask for, the chief *alcalde* of the Queres, Don Antonio Armenta, placing them in

possession thereof, provided that no prejudice results to the Indians and residents settled in that vicinity, and it having been so done, following this decree he shall place the said taking of possession without prejudice to a third party, in order to copy it in the government book, and to write it out on stamped paper when the same shall reach this province.

"CONCHA. (Scroll.)

"At this Cañon of San Diego on the sixth day of the month of February, of the year one thousand seven hundred and eighty-eight, I, Don Antonio de Armenta, chief *alcalde* and war captain of the jurisdiction of the Queres, by virtue of the authority that is conferred upon me by Señor Don Fernando de la Concha, Knight Commander of Mora in the Order of Santiago, lieutenant colonel of the royal armies, civil and military governor of this province of New Mexico, being at the said cañon, having cited the natives of the *pueblo* of Jemez, who are the adjoining owners to said land, and having designated to them that which was their own they were well suited on account of receiving no injury by the giving of said *cañon*, and also knowing that it is the will of our Sovereign that his lands be peopled by his vassals in whatever surplus there may be, and finding no obstacle whatever that could interfere with it, and exercising the authority that is conferred upon me, I went to said Cañon of San Diego, and no one appearing who had a better right, nor there being any prejudice to a third party who might make objection, and said Indians, Francisco Garcia de Noriega, interpreter for the Navajos, and his brother, José Antonio Garcia de Noriega, being present and understanding it all, I took them by the hand, I conducted them over said lands, they pulled up grass, threw stones to the four cardinal points, and we all said together three times, 'Long live the King, our Lord (whom may God preserve,)' as evidence of true possession, which they received quietly and peaceably without any opposition, their boundaries being the following: On the north side, the waterfall (*salto del agua*); on the south side, the junction of the rivers and also a point of a red table land (*una mesa colo-*

*rada,*) and lands of said Indians. With respect to the east and west there is nothing more than some very high table lands on both sides of the *cañon,* which (table lands) serve as boundaries. And, there resulting no prejudice whatever, they were satisfied with them (the boundaries); and in order that it may so appear I, said chief *alcalde,* Don Antonio de Armenta, signed it, together with my two attending witnesses, with whom I act for lack of a public or royal notary, of which there is none of any kind in all this government, to all of which I certify.

" The interlineation ' river ' is valid.

     . "ANTONIO DE ARMENTA. (Scroll.)

  " (Armenta's scroll.)

"Witness: SALVADOR ANTONIO SANDOVAL. (Scroll.)

"Witness: NICOLAS ORTIZ. (Scroll.)"

There are some differences between petitioners' translations and those of the Government, the principal being in the opening words of the alleged grant, which in Spanish were: "Concedo en nombre del Rey el cultivo y labor de la tierra que solicitan los Supplicantes," etc. These words are translated by petitioners: "I grant in the name of the King, for cultivation and working, the land that the petitioners solicit"; and by the Government: "I grant, in the name of the King, the cultivation and working of the land which the petitioners ask for."

The granting papers of the grant of 1798 were as follows:

    "Seal Third. [Seal.] Two Rials.

"For the years one thousand seven hundred and ninety-eight and ninety-nine.

" *To the lieutenant colonel and governor of this province :*

"Francisco and Antonio Garcia, brothers, and interpreters of the Navajo nation, in unison with Miguel Garcia, Joaquin Montoya, Salvador Garcia, José Manuel Garcia, Juan José Gutierez, Juan de Aguilar, Blas Nepumuceno Garcia, Bartholomew Montoya, José Montoya, Tomas Montoya, Juan Domingo Martin, José Gonzales, Salvador Lopes, Antonio

Abad Garcia, Miguel Gallego, Marcos Apodaca, José Miguel. Duran and José Maria Jaramillo, appear before your Excellency in the most approved manner the law requires and may be necessary, and state that a quantity of vacant and uncultivated land lies in the Cañon of San Diego, adjoining the boundaries of the land belonging to the Indians of the town of Jemez; and whereas the settlement thereof would be beneficial to the provinces, and advantageous to our present families and descendants to be settling upon these lands with our property and cultivating the same, we pray your excellency to be pleased to grant this aid and settlement that we petition for to the persons herein mentioned; being pleased at the same time to order, in the name of his Majesty (whom may God preserve), that we may receive from the boundaries beyond the land granted to the Indians of the pueblo, our petition calling for from east to west to the middle arroyo called Los Torreones, and the line running from north to south to the Vallecelo de la Cueva which is in front of the waterfall, and in a transverse line from said middle arroyo to the Rito de la Jara. We also protest that we will not injure with our persons or stock, a few trees which the Indians claim as their own, although they are planted beyond the limits of the lands which belong to them. Therefore we humbly pray your Excellency to be pleased to order our request to be complied with, granting us the vacant land asked for; by doing which we will receive grace, and we swear, in due form, that our petition is not made through malice; and one signed, the others not knowing how.

"JOSÉ MIGUEL GARCIA.

"*Decree.*

"In view of the foregoing petition made by José Miguel Garcia and other citizens therein mentioned, in regard to settling in the cañon known as San Diego de Jemez, where the interpreters of the Navajo nation were temporarily stationed, I grant to them the aforesaid land in the name of the King, our sovereign, with the expressed condition that it is to be settled by at least twenty citizens; that the lands are to be

distributed in equal parts, and that they are not allowed or authorized, for themselves or their heirs, to sell or dispose of the lands granted to them. It being his Majesty's will, according to his last orders, that the lands should descend from father to son, or his heirs in a direct line; and if any colonist, to suit his own conscience, should desire to remove, under any pretext whatever, his possession or share shall remain for the benefit of the one taking his place, in which case the residents of the same place, or persons marrying there, shall be preferred, and for which no remuneration whatever shall be exacted by the person voluntarily absenting himself, or expelled or banished by the authorities on account of his bad conduct; that besides the subdivision above mentioned, a sufficient amount of land is to be left for pastures and watering places as well as to allow for the increase of the settlement, if such may be the case (which is likely to occur) — (torn) — order of the chief justice of that jurisdiction, Don Antonio Armenta, to place the parties in possession under the rules prescribed by law. CHACON.

"*Possession.*

"In the Cañon de San Diego de los Jemez, on the fourteenth day of the month of March, in the year one thousand seven hundred and ninety-eight, I, Don Antonio Armenta, chief justice of the Pueblo of Jemez, by virtue of the authority conferred upon me by my superior, Don Fernando Chacon, gentleman of the order of Santiago, lieutenant colonel of the royal armies, political and military governor of this province of New Mexico, being at the aforesaid place, and having summoned the natives of said Pueblo of Jemez, to whom having measured the league belonging to them, I found a surplus of two thousand one hundred varas, which they had before arriving at the Cañon de San Diego, all of which they claimed as their own, without having any right to them in any manner; and believing that it is the wish of our sovereign that his land be settled upon by his subjects wherever a surplus may be found, and finding no impediment whatever, and using the authority in me vested, I proceeded to the surplus lands, and finding no one with a better title, and Francisco Garcia, An-

tonio Garcia, Navajo interpreters, Miguel Garcia, Joaquin Montoya, Salvador Garcia, José Manuel Garcia, Juan José Gutierrez, Juan de Aguilar, Juan Blas Pumuceno Garcia, Bartolome Montes, Tomas Montoya, José Montoya, Juan Domingo Sangil, Salvador Lopez, José Gonzales, Antonio Abad Garcia, Miguel Gallegos, Marcos Apodaca, José Miguel Duran and José Jaramillo, being present, all interested and well informed in regard to the matter, I took them by the hand, walked them over said lands, they pulled up grass, threw stones towards the four winds, and we all cried at once, three times, Live the King our sovereign (whom may God preserve) in proof of legal possession, which they received quietly and peaceably without any opposition whatever, because, after concluding all these ceremonies, I delivered to each one of the said settlers three hundred varas, with which they were well satisfied, leaving the remainder for the benefit of all, and without any other lands being left for any person to enter; and in order to prevent any other from coming to meddle and create difficulties between the citizens, as well as the Indians, I gave time to understand which were their boundaries, which are: On the north, the Vallecito de la Cueva, on the south the termination of the Indian league. On the east, the boundary of Vallecito; and on the west, the opening towards the middle arroyo and the Rito de la Jara; and no injury resulting to any one they were all satisfied, and in order that it may so appear, I, the said chief justice, signed with my two attending witnesses in the absence of a public or royal notary, there being none within the limits of all this government, to which I certify.

"ANTONIO DE ARMENTA.

"Witnesses:

"SALVADOR LOPEZ.

"JOSÉ MIGUEL GARCIA."

In 1879, when the documents of 1788 were produced by claimants and filed in the archives, the following certificate was also brought forward by them and put on file:

"In the Cañon de San Diego de Jemez on the fourteenth day of the month of March, year 1798, before me, Antonio

de Armenta, and there being assembled all the citizens who
took possession of the said cañon, together with Francisco
Garcia de Noriega and Antonio Garcia de Noriega, two
brothers of the first possessors, said Garcias declared in a
loud and clear voice, which all heard, because they shouted it
with much distinctness, and they all unanimously agreed to
abide by what was said by the said Garcias, and their reasons
were these.   Friends and brothers, now each of you is about
to take the lands, which His Majesty has granted and donated
to you; but you are all notified that the lands, which we first
and in our first grant, we have been possessing, be all of you
aware that I, and my brother are going to enjoy the same
freely, without any of those present, nor their children nor
anybody else shall desire to interpose obstacles, and because
as first possessors we have the right to enjoy said lands and
to cultivate them with full title, as well ourselves, our chil-
dren and our successors; and so that none of those who are
present may plead ignorance we have so spoken to-day there
being no one absent.   The said Garcias having made all the
remarks, all unanimously replied that they asked reasonable
justice and that neither by themselves, their children, nor
successors would there be interposed any suit or demand
against them at any time, and if they perchance should wish
to do so they would take the case until leaving them in peace
concerning the said land which they had been so justly pos-
sessing.

" All here set forth I, said chief justice, witness, for all of
the citizens declared that it was not to them any imposition
that the Messrs. Garcias should enjoy the lands which they
were heretofore cultivating, and that it may so appear when-
ever requisite I will make this document in favor of the said
two Garcias, I sign the same with those of my attendance in
the aforesaid cañon in said day, month and year, to which I
certify.

"ANTO. DE ARMENTA."

It also appeared that there were among the old archives the
following:

"Governor: The interpreter of the Navajos, Antonio Garcia, has presented to me a document executed to him by the former alcalde of this jurisdiction, Antonio de Armenta, under the decree of Don Fernando de la Concha, as appears from the grant itself, and the whole of the Jemez Cañon, having been settled under an order of Don Fernando Chacon in a royal grant made to them and in which it embraced the lands granted to the Garcias, whence results contention between the one and the others the latter grantees alleging title to all the land; and I, deeming that the title claimed by Antonio Garcia is founded in law, he having been the prior settler for the period of ten years, with the condition that at the time they were given possession all the new settlers gave their consent, as said Garcia makes appear by a document which the alcalde executed to the two brothers and which I enclose to you, together with the grant of the Garcias, so that after seeing you may order whatever you shall deem proper and may, if Garcia has a right to the land claimed, confirm and approve the same, to obviate all questions which will necessarily result if the latter be not decided by your superiority that the land of the Garcias is included or not in the grant of the last settlers and whether a copy of this grant be taken so that the original, which is the one I enclose, may remain in the archives of the Government confirmed by you, and the same to be done with a copy, subject to what you may direct, which will be the best and most correct, your ordering what I shall do to avoid proceedings annoying your attention. God preserve you many years.

"IGNATIO SANCHEZ VERGARA.

"Santa Ana, 1st of December, 1808.

"Lieutenant Colonel José Manrique."

"Advised of your official communication of the first instant and documents you accompany.

"I will state to you that the subject does not require any decision of mine inasmuch as the grant of the Garcias makes their right clear, which grant being the older always has a

preference. The last settlers cannot deny to the Garcias a better title and so these should always remain on the same grant which they have held hitherto; and if the said new settlers do not coincide you will not permit them recourse for and such which they may possess, they will not have the royal audience of Guadalajara, as the documents referred to were sanctioned by former governors of this province and the said royal audience alone can annul them; with which I answer your official communication before mentioned. I return to you the documents mentioned that you may deliver them to the party interested. God preserve you many years.

"Santa Fé, 13th of December, 1808.

"To the alcalde of Jemez."

On the 4th day of June, 1859, certain claimants for themselves and in the name of the actual settlers petitioned the Surveyor General of New Mexico, Pelham, for a confirmation of the grant of March 6, 1798, who took action thereon. In the proceedings it appeared from the evidence that a town existed on the grant some sixty years before and was in existence when the United States took possession, and the testimonio of the original granting papers, heretofore given, certified to as correct and genuine by the alcalde, Don Antonio Armenta, with his attending witnesses, on March 16, 1798, in due form, "at the verbal request of the parties," which was then on file in the office of the Surveyor General, was considered and acted on by him. The Surveyor General made his report to Congress, under date June 10, 1859, approving the grant, and stating that "the evidence shows that the town has been in continuous occupation of the claimants, and was in existence when the United States assumed sovereignty over the country." The grant was thereupon confirmed by Congress, June 21, 1860, 12 Stat. 71, c. 167, § 3. The patent for this grant was issued October 21, 1881, to the original twenty grantees and those claiming under or through them.

In 1879, Amado Chaves, for himself and the other heirs of the two Garcias, petitioned the then Surveyor General, Atkinson, for the approval and confirmation of the grant of 1788,

and in the proceedings before him the papers of that date, together with the certificate of Alcalde Armenta of March 14, 1798, were produced and filed, and considered with the correspondence of 1808, and sundry depositions. The Surveyor General approved the grant, March 22, 1880, and transmitted a certified transcript of the papers for the action of Congress, but the grant was not confirmed.

The evidence tended to show that Francisco and Antonio Garcia were two Spanish brothers, who were interpreters for the Navajos; that Francisco was killed in 1807, and that Antonio died in 1835.

The depositions of two witnesses, one of them the great grandson of Francisco Garcia, born in 1827, and the other the grandson of Antonio Garcia, born in 1807, were taken by Surveyor General Atkinson in January, 1880. Both gave the south boundary of the tract sued for as the junction of the San Diego and the Guadalupe Rivers, "and the lands of the Indian pueblo of Jemez." Both testified that the tract was reputed to belong to the heirs of the two Garcias; that Francisco was reputed to have lived thereon; and that Antonio, who survived until 1835, lived there to their knowledge.

In addition to these depositions, petitioners called as a witness another great grandson of Francisco, born in 1850, who testified that his grandmother was born on the tract, and that "she said the land was occupied and cultivated by them," the two Garcias. What particular part of the tract she was born on and the particular place of occupancy and cultivation did not appear.

The evidence on behalf of the Government was to the effect that Antonio Garcia occupied land several hundred varas in extent, running north from the north boundary line of the Indian pueblo, which was subsequently sold by Antonio's grandson to one of the witnesses, who thereupon took up his residence in Antonio's house; that Antonio said that he had "lands in the Indians' league"; "from the Pueblo Indian league up north"; that the ranches were in the cañon and divided into portions of 300 varas each; that heirs of the original grantees or persons claiming under them still held

original allotments north of the junction of the rivers; and that the smaller grant was not generally known.

The survey of May 18, 1880, was as shown in the map on the next page.

The Court of Private Land Claims, two members dissenting, held that the claim under the grant of 1788 had been abandoned, and dismissed the petition.

*Mr. Henry M. Earle* for appellants.

*Mr. Matthew G. Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

By the Spanish law in force at the time of the alleged grant of 1788, lots and lands were distributed to those who were intending to settle, and it was provided that " when said settlers shall have lived and labored in said settlements during the space of four years, they are hereby empowered, from the expiration of said term, to sell the same, and freely to dispose of them at their will as their own property." But confirmation by the audiencia, or the governor, if recourse to the audiencia was impracticable, after the four years had elapsed, was required in completion of the legal title. Laws Indies, Lib. IV, Tit. 2, Law 1; Royal Order of 1754; 2 White's New Recop. 48, 62. This is admitted except that it is said that confirmation was not needed, and was not usually had, until the settler sought to exercise the power of disposition.

It was also provided that it should " not be lawful to give or distribute lands in a settlement to such persons as already possess some in another settlement, unless they shall leave their former residence and remove themselves to the new place to be settled, except where they shall have resided in the first settlement during the four years necessary to entitle them to fee simple right, or unless they shall relinquish their title to the same for not having fulfilled their obligation." Lib. IV, Tit. 12, Law 2; 2 White, 49.

Plat of the Cañon de San Diego Grant, surveyed by Rob't G. Marmon, U. S.
Deputy Surveyor, May, 1880.   Scale 80 chains — 1 in.

We are of opinion that the granting papers in this record taken together do not justify the presumption of settlement and working by the two Garcias on the tract contained in the grant of 1788, for the ten years prior to 1798, or for four years thereof, or any confirmation of the grant thereupon; but that the contrary is to be inferred from the testimony in respect of possession; and that Armenta's certificate of 1798 and the correspondence of 1808 conduct to no other result.

The two Garcias were interpreters to the Indians and they may not unreasonably be supposed to have resided, in that capacity, at the pueblo, or on lands claimed by the Indians as appurtenant thereto.   The language of the petition and decree of 1788 was perhaps somewhat peculiar, and it is manifest that Governor Chacon regarded " the cultivation and working of the land " by them as not permanent in character; for when the petition for the grant of 1798 was presented to him on behalf of the two Garcias and eighteen others, he referred in his decree to the interpreters as " temporarily stationed " on the tract solicited, and must be assumed to have been aware of the nature of their occupation.

The petition of 1798 was a petition for settlement, and it nowhere intimates that the two Garcias, petitioners " in unison " with the other eighteen proposing to settle, claimed an independent interest in the Cañon de San Diego by virtue of the alleged grant of 1788, but on the contrary it states that " a quantity of vacant and uncultivated land lies in the Cañon of San Diego, adjoining the boundaries of the land belonging to the Indians of the town of Jemez," and that " the settlement thereof would be beneficial to the provinces and advantageous to our present families and descendants."   The terms of the decree are entirely inconsistent with the recognition of such a claim, and so is the act of juridical possession.   In that act the Alcalde, Armenta, states that in the Cañon de San Diego de los Jemez, having summoned the natives of the pueblo of Jemez, to whom was measured the league belonging to them, he found a surplus of two thousand one hundred varas, which the Indians had, before arriving at the Cañon de San Diego, and were claiming as their own, but to which he

says they had no right in any manner; and believing that it. was the wish of the sovereign that his lands be settled by his citizens wherever a surplus was found, finding no impediment, and using the authority in him vested, and finding no one with a better title, and Francisco Garcia and Antonio Garcia, the Navajo interpreters, and the eighteen other petitioners, (naming them,) being present, "all interested and well informed in regard to the matter," he took them over the lands, performing the usual formal acts in proof of legal possession, "which they received quietly and peaceably without any opposition whatever, because, after concluding all these ceremonies, I delivered to each one of the said settlers three hundred varas, with which they were well satisfied, leaving the remainder for the benefit of all, and without any other lands being left for any person to enter"; and he gave them time to understand the boundaries, which were: "On the north, the Vallecito de la Cueva, on the south the termination of the Indian league. On the east, the boundary of Vallecito; and on the west, the opening towards the middle arroyo and the Rito de la Jara"; adding: "and no injury resulting to any one they were all satisfied." Of these boundaries the southern was the north boundary of the Indian pueblo, and in making the subdivision Armenta apparently started from that boundary and, after reaching the junction of the Guadalupe and the San Diego, followed up the San Diego, which flowed through the cañon. He made the distance from the north boundary of the pueblo to the south boundary of the cañon 2100 varas, and, therefore, if he subdivided that space, must have allotted at least 3900 varas within the alleged grant of 1788, for he certified that he delivered to "each one of the said settlers three hundred varas," which would be six thousand varas in all for twenty settlers. The government survey shows that distance to have been something short of 3400 varas. If Armenta meant by "the said settlers" the eighteen co-petitioners, and left to the interpreters as contradistinguished from these settlers what they were cultivating between the two boundaries, then 5400 varas were allotted to the eighteen within the grant of 1788.

In any view, allotments were made north of the south

boundary of the grant now claimed, which was entirely embraced by the grant of 1798.

The evidence for the petitioners did not show where the two interpreters were located and what the particular tract was that was reputed to belong to them in fee, but the evidence for the Government tended sufficiently to establish that they did not actually cultivate any part of the grant of 1788 prior to 1798. It must be conceded that wherever the interpreters were, they were together, and it is quite clear from the testimony that Antonio Garcia, who survived until 1835, when one of the witnesses was twenty years old, cultivated and claimed ownership of land not within the boundaries of the grant of 1788, but between the south boundary of that tract and the north boundary of the Indian pueblo; and the presumption is that this was so in respect of Francisco.

It is true that when Armenta gave juridical possession under the grant of 1788, he described the south boundary as "the junction of the rivers and also a point of a red table land and lands of said Indians." But at that time the Indians claimed to the junction of the two rivers, and no attempt was then made by Armenta to determine the boundary of the pueblo, as it would seem would have been the case if the grant had been of land for settlement with the intention of acquiring the legal title.

When the proceedings were had before the Surveyor General in 1879–80, the original papers of 1788 were produced by claimants, and also an independent paper purporting to have been signed by Armenta on the 14th day of March, 1798, at the cañon, stating "there being assembled all the citizens who took possession of the said cañon, together with Francisco Garcia de Noriega and Antonio Garcia de Noriega, two brothers of the first possessors"; and that "the said Garcias declared in a loud and clear voice, which all heard, because they shouted it with much distinctness, and they all unanimously agreed to abide by what was said by the said Garcias, and their reasons were these. Friends and brothers, now each of you is about to take the lands, which his Majesty has granted and donated to you; but you are all notified that

the lands, which we first and in our first grant, we have been possessing, be all of you aware that I, and my brother are going to enjoy the same freely, without any of those present, nor their children nor anybody else shall desire to interpose obstacles, and because as first possessors we have the right to enjoy said lands and to cultivate them with full title, as well ourselves, our children and our successors." And "all unanimously replied that they asked reasonable justice and that neither by themselves, their children, nor successors would there be interposed any suit or demand against them at any time"; and that they should be left "in peace concerning the said land which they had been so justly possessing." And to this Armenta bore witness, because "all of the citizens declared that it was not to them any imposition that Messrs. Garcias should enjoy the lands which they were heretofore cultivating."

There is nothing to show and we think the presumption cannot be indulged that this so called certificate was brought to the attention of Governor Chacon, and the alcalde certainly had no authority in himself to make an exception to the grant.

The grant of 1798 was a grant for settlement, and by the allotments contemplated to be made and which were made, so many parcels, of three hundred varas each, specifically situated in whole or in part within the cañon and the alleged grant of 1788, were set off, so that if an exception could have been created by this independent paper, it involved the proposition that after the allotments had been made, eighteen of the twenty allottees assented to be deprived of any right or title to the lands which had just been assigned to them, and would have been repugnant to the grant.

Again, there was no intimation of such an exception in the petition, the decree, or the act of juridical possession, nor any mention of the execution of this paper in that act, nor does it appear that it was placed in the archives with the title papers, and when Armenta certified to the testimonio on the 16th of March, 1798, he did not include nor make any mention of this certificate. Moreover, it was not attested by witnesses, as required in the instance of official documents, in the

absence of a public or royal notary, of which there was "none within the limits of all this government," as Armenta certified in the act of juridical possession. It is impossible to treat this paper as of legal validity as an exception, and to give it the same force and effect as the act of juridical possession or as if it were a direct reconveyance.

But treating the paper as genuine and entitled to consideration as evidence, it amounts to nothing more than the statement of an assent on the part of the eighteen that the Garcias should not be disturbed as to the particular land they were cultivating, which we are satisfied from the evidence was not within the grant of 1788 at all. It furnishes no basis for permitting the Garcias to repudiate the official action of the alcalde in making the allotments to their co-petitioners, they having been present, participating in the proceedings, and parties to the transaction from the beginning.

This brings us to consider the papers of 1808, which consist of a communication of Alcalde Vergara to Governor Manrique and an unsigned note purporting to be the governor's reply thereto. The alcalde states that "the interpreter of the Navajos, Antonio Garcia," has presented to him a document in his favor, executed by the former alcalde, Armenta, under the decree of Governor Concha, "as appears from the grant itself, and the whole of the Jeméz cañon having been settled under an order of Don Fernando Chacon in a royal grant made to them, and in which it embraced the lands granted to the Garcias, whence results contention between the one and the others, the latter grantees alleging title to all the lands; and I, deeming that the title claimed by Antonio Garcia is founded in law, he having been the prior settler for the period of ten years, with the condition that at the time they were given possession all the new settlers gave their consent, as said Garcia makes appear by a document which the alcalde executed to the two brothers and which I enclose to you, together with the grant of the Garcias, so that after seeing you may order whatever you shall deem proper and may, if Garcia has a right to the land claimed, confirm and approve of the same, to obviate all questions which will necessarily re-

sult if the latter be not decided by your superiority that the land of the Garcias is included or not in the grant of the last settlers." . . .

It will be perceived that the controversy is asserted to be not whether the Garcias' land included that of the other settlers, but whether the land of the latter embraced that of the Garcias. It is this question which the governor is asked to determine. The "others" are plainly the eighteen settlers, and they are the grantees who are said to be alleging title to all the lands. The reply of the governor stated that the subject did not require his decision, "inasmuch as the grant of the Garcias makes their right clear, which grant being the older always has a preference"; and that the last settlers could not deny to the Garcias a better title, and so these "should always remain on the same grant which they have held hitherto." And he added that "if the said new settlers do not coincide," he should not permit them recourse, for "as the documents referred to were sanctioned by former governors of this province," the royal audiencia of Guadalajara alone could annul them.

This correspondence was entirely *ex parte* and without the knowledge of the other settlers, and was in no respect judicial action. The reply signified the individual opinion of the governor, not that the new settlers could be driven from their own holdings, but that they could not claim the land actually occupied by the Garcias. And he expressly declined to adjudicate in the premises because unable to take jurisdiction in respect of documents "sanctioned by former governors." Now what had been sanctioned in 1789 by Governor Chacon was the grant and allotments of that date, and it does not appear that in 1808 the validity of those allotments was questioned. The communication of Vergara related to the land that had been formerly cultivated by the Garcias and to which they were given a preferred right by Armenta at the time of delivering juridical possession in 1798; and Vergara stated that the whole of the cañon had, when he wrote, been settled under the grant of that year.

The Court of Private Land Claims held that Governor

Chacon was justified in regarding the petition to him as in the nature of a request on the part of the Garcias to make to the twenty petitioners a grant of the whole tract within the boundaries specified and as an offer of release of all claims to any part of the land by virtue of the grant of 1788; that the act of juridical possession showed that the twenty petitioners, including the Garcias, were placed in possession and each received three hundred varas of land, leaving the remainder to be held in common; that the certificate of Armenta of 1798 was probably signed before the act of juridical possession, and reasonably bore the construction that the petitioners had agreed, in pursuance of an original understanding, that a colony of twenty persons should be formed, of which the two Garcias should be members, to settle in the cañon and that the Garcias should surrender all claim under the grant of 1788, and accept their proportion of the new grant with the new settlers, share and share alike; that the Garcias accepted the agreement of their co-grantees as a guarantee that in any distribution of the land which might be made their allotments should cover the particular portion which they had theretofore been cultivating; that by thereafter accepting their allotments the Garcias became parties to the official action of the alcalde and were bound by it; and that they each accepted three hundred varas as their equal part in compliance with the terms of the grant and of the agreement, and to their entire satisfaction. On the other hand, it might fairly be argued that Armenta in the act of juridical possession in 1798 left to the Garcias all the land which they were actually cultivating south of the south boundary of the grant of 1788, and assigned to the eighteen last settlers 5400 varas north of that boundary and in the grant itself, and that the certificate of 1798 was merely in authentication of an assent to the allotment to the Garcias, as co-settlers with the eighteen, of lands previously possessed by them south of the grant of 1788, and not to an exception of that grant out of the grant of 1798. Although the Garcias, if they should be regarded as prior settlers, did not "leave their former residence and remove themselves to the new place to be settled," they brought

themselves into connection with it and relinquished whatever rights they had outside of the particular land resided on and cultivated. The 2100 varas were surplus lands so far as the Indians were concerned, and vacant in the sense that the Indians had no title to them, yet nevertheless the interpreters may have been in occupation thereon as outlying Indian lands, and upon the surplus being ascertained, may have asserted a superior right to what they were there cultivating, and demanded that that be conceded in the distribution under the new grant. If this were so, it would satisfactorily explain the certificate of Arménta and the contention referred to by Vergara.

We are not dealing with the rights of the Garcias as between them and other claimants, but with the rights of the Garcias as between them and the Government of Spain, and in that regard the question is whether that Government conveyed to others what had already been conveyed to the Garcias. Whether then the Garcias did or did not take three hundred varas each north of the south boundary of the grant of 1788, they would be equally bound by their participation in the grant of 1798, although in the distribution thereunder they were allotted even more than that south of that boundary under the circumstances.

Accepting either construction of the documents and in the light of all the evidence, the conclusion of the court below was correct.

The suggestion that some of the allotments may have been in the Cañon Guadalupe finds no such support in the record as to require consideration.

*Affirmed.*