GRAINGER et al. v. DOUGLAS PARK JOCKEY CLUB.

(Circuit Court of Appeals, Sixth Circuit.   October 27, 1906.)

No. 1,571.

1. STATUTES—DETERMINATION OF VALIDITY.

The constitutionality of a statute must be determined by its provisions, and not by the manner in which it is in fact administered.

2. CONSTITUTIONAL LAW—VALIDITY OF STATUTE—DEPRIVING PERSON OF LIBERTY OR PROPERTY.

A statute or ordinance depriving one of his liberty or property is not in violation of the fourteenth constitutional amendment, merely because of such deprivation; but, to bring it within the amendment, it must have no real or substantial relation to the public welfare, or the deprivation must be brought about without due process of law or amount to a denial of the equal protection of the laws.

3. SAME—EQUAL PROTECTION OF LAWS—CLASSIFICATION IN STATUTE.

A statute or ordinance depriving one of liberty or property does not amount to a denial of the equal protection of the laws, because it does not apply to all persons; the Legislature having the right to make classifications providing they are reasonable and not arbitrary, and the test being that to be valid they must rest upon some reason of public policy and have some real and substantial relation to the object sought to be accomplished.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 678.]

4. SAME.

A statute regulating the right to carry on a particular business is not unconstitutional, as a denial of the equal protection of the laws, because of a classification based on equipment, personal fitness, past history, or other reasonable considerations, and the determination of such matters and the power of selection may be committed to administrative officers.

5. SAME—POWER OF COURTS.

A court has no right to invalidate or overthrow legislation depriving a person of his liberty or property or making a discrimination as to the persons to whom it is applicable, unless it is palpably clear that it has no real and substantial relation to the public welfare; the right to determine what such welfare demands being primarily in the Legislature or local assembly or officer acting under its authority, and every presumption being in favor of its rightful exercise.

[Ed. Note.—For case in point, see Cent. Dig. vol. 10, Constitutional Law, § 46.]

6. SAME.

If legislation depriving one of his liberty or property, or making a discrimination as to the persons to whom it is applicable, does in fact have a real and substantial relation to the public welfare both so far as said deprivation and discrimination are concerned, the motive which prompted its enactment cannot be inquired into by the courts.

7. SAME—VALIDITY OF STATUTE—KENTUCKY ACT REGULATING RACING.

Act Ky. March 23, 1906, creating a state racing commission, and regulating the racing of running horses, which, while excepting from its provisions trotting meetings or races and races conducted by fair associations, prohibits the conducting of any running race in the state except by a corporation or association licensed by the commission, which is empowered to grant and revoke such licenses, to adopt regulations for racing which must be observed by its licensees, and to fix the time in each year during which any association may conduct racing, which must be between the 1st of April and the 1st of December, its action in certain matters being subject to review by the courts, while it may operate to deprive persons

148 F.—33

or corporations of their liberty or property, and to create discriminations, cannot be held to have no real and substantial relation to the public welfare, nor to be in violation of the fourteenth amendment of the Constitution, as denying to any person the equal protection of the laws.

**8. COURTS—JURISDICTION OF CIRCUIT COURT OF APPEALS—ORDER GRANTING PRELIMINARY INJUNCTION.**

That a Circuit Court has jurisdiction of a suit only by reason of the fact that it involves a question arising under the Constitution or laws of the United States, so that an appeal from the final decree therein will lie only to the Supreme Court, does not deprive the Circuit Court of Appeals of jurisdiction to review an order granting a preliminary injunction therein, under Act April 14, 1906, c. 1627, 34 Stat. 116, amending section 7 of Act March 3, 1891, 26 Stat. 828 [U. S. Comp. St. 1901, p. 550], creating said court.

Appeal from the Circuit Court of the United States for the Western District of Kentucky.

D. W. Saunders and Lewis McQuown, for appellants.

H. W. Bond and Helm Bruce, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This is an appeal from an interlocutory order granting a preliminary injunction. It was made May 24, 1906, in a suit brought May 15, 1906, by the appellee, a Kentucky corporation created and organized December 12, 1905, against the appellants, Charles F. Grainger, Louis des Cognets, J. P. Chinn, Milton Young, and E. F. Clay, all citizens of Kentucky. All of the appellants except Charles F. Grainger reside in the Eastern district of Kentucky, but the appellee has its place of business, and hence resides, in the Western district. Diversity of citizenship not existing, the lower court did not have jurisdiction of the suit on that ground. The sole ground of jurisdiction was that the basis of the relief sought was state action claimed to have been in violation of the tenth section of the first article of the federal Constitution and the fourteenth amendment thereto. This being so, this court will not have jurisdiction of an appeal from the final decree therein. That must go to the Supreme Court. It has jurisdiction of this appeal from said interlocutory order by virtue of the Act of Congress of April 14, 1906 (chapter 1627, 34 Stat. 116), amending the seventh section of the act establishing the Circuit Courts of Appeals (Act March 3, 1891, c. 517, 26 Stat. 828 [U. S. Comp. St. 1901, p. 550]), so as to give them jurisdiction of an appeal from an interlocutory order or decree granting or continuing an injunction or appointing a receiver "in any cause" instead of in "a cause in which an appeal from a final decree may be taken under the provisions" of said act to the Circuit Court of Appeals as before.

The Douglas Park Jockey Club was empowered by its charter to acquire, equip, and operate in Jefferson county, Ky., within which the city of Louisville is located, a race track for running horses, and prior to the bringing of this suit it had acquired 125 acres of land adjoining said city and equipped it for said purpose at an expense of $225,-000. The most, if not all, of this expense was incurred prior to the doing of any of the acts complained of in said suit.

The five individual appellants are the constituent members of the state racing commission appointed April 2, 1906, by the Governor of Kentucky, under an act of the Legislature thereof, approved by him March 23, 1906, and which then became a law by virtue of an emergency clause. Said act is as follows:

"An act to regulate the racing of running horses in the commonwealth of Kentucky and to establish a state racing commission and prescribing its powers and duties.

"Be it enacted by the General Assembly of the commonwealth of Kentucky:

"Section 1. Any corporation formed for the purpose of racing and breeding or improving the breed of horses and conducting races and contests of speed, shall have the power and right, subject to the provisions of this act, to hold one or more running race meetings in each year, and to hold, maintain, and conduct running races at such meetings. At such meetings the corporation or the owners of the horses engaged in such races, or others who are not participants in the racing, may contribute purses, prizes, premiums or stakes to be contested for; but no person or persons other than the owner or owners of a horse or horses contesting in a race shall have any pecuniary interest in the purse, prize, premium or stake contested for in such a race, or be entitled to, or receive any portion thereof after such race shall have been finished; and the whole of such purse, prize, premiums or stake shall be allotted in accordance with the terms and conditions of such race. Such meeting shall not be held except during the period extending from the 1st day of April, to the 1st day of December, inclusive in each year. No running races are authorized or shall be permitted except during the period aforesaid, nor except between sunrise and sunset.

"Sec. 2. A state racing commission is hereby established, to consist of five persons to be appointed by the Governor, three of whom shall be breeders and raisers of thoroughbred stock, and no two of whom shall be members of the same racing association. The members of said commission shall hold their offices for a term of four years, and the first commission shall be appointed within twenty days after this act shall go into effect. Such commission shall appoint a secretary, who shall serve during its pleasure, whose duty it shall be to keep a full and faithful record of its proceedings, and preserve at its general office all books, maps, documents and papers intrusted to its care, and perform such other duties as the commission may prescribe. He shall be paid a salary, to be fixed by the commission at a rate not exceeding $1,200 per annum which shall be paid by the several racing corporations or associations, the amounts to be paid by each to be apportioned by the commission, which shall on or before the 1st day of December in each year assess upon each of said corporations or associations its just proportion of such salary. The commission shall biennially make a full report to the General Assembly of its proceedings for the two year period ending with the 1st day of December preceding the meeting of the General Assembly, and shall embody therein such suggestions and recommendations as it shall deem desirable.

"Sec. 3. Said commission shall have the power to prescribe the rules, regulations and conditions under which running races shall be conducted in this state, and no such races shall be conducted, except by a corporation or association duly licensed by said commission, as herein provided. Any corporation or association desiring to conduct such racing may annually apply to the state racing commission for a license to do so. If in the judgment of the commission a proper case for the issuance of such license is shown, it may grant the same for a term of one year; and every such license shall contain a condition that all races or race meetings conducted thereunder shall be subject to the rules, regulations, and conditions from time to time prescribed by the commission, and shall be revocable by the commission for any violation thereof, or whenever the continuance of such license shall be deemed by the commission not conducive to the interests of legitimate racing.

"But if said license is refused or revoked, said commission shall publicly state its reasons for so doing, and said reasons shall be written in full in the minute book of said commission, which shall at all times be subject to

inspection upon application of any one desiring to do so; said finding of said commission shall be subject to the review of a court of competent jurisdiction; provided, that a refusal of the commission to grant to any racing association a license or to assign any racing association at least forty days in each year if desired for racing at such association, and the decision of such commission revoking any license of any association shall be subject to review of the courts of the state.

"Sec. 4. Every running race meeting at which racing shall be permitted for any stake, purse or reward, except as allowed by this act, is hereby declared to be a public nuisance, and every person acting or aiding therein shall be deemed guilty of a misdemeanor and punished by a fine of not less than $500 nor more than $1,000 for each day of such meeting or racing; and in addition thereto, in a suit brought for the purpose by the state racing commission in the circuit court of the county where it may be proposed to conduct such unauthorized racing, an injunction may be obtained against the same.

"Sec. 5. This act shall not apply to trotting meetings or races, nor shall it apply to racing conducted by any state, county or other fair association, holding not more than one meeting annually, and for a period not exceeding six days for such meeting.

"Sec. 6. Inasmuch as there is no general law regulating racing in this commonwealth, and it is desirable that one should be in operation as soon as possible, an emergency is hereby declared to exist and this act shall be in full force and effect from and after its passage."

Its provisions can be stated and grouped in a way to impress them on one's mind, and we think, though at the risk of tediousness, that this should be done.

This act has no application to trotting races. It applies only to running races. It has no application to such races when conducted by any state, county, or other fair association holding not more than one meeting annually and for a period not exceeding six days for such meeting. It prohibits running races not so conducted, except when conducted by a corporation or association formed for that purpose, and by such corporation or association unless licensed by the commission so to do. It further prohibits a corporation so formed and licensed from running such races except between April 1st and December 1st, inclusive, in each year, and between sunrise and sunset. It provides that no one save the owners of the horses participating in the races shall have any pecuniary interest in the stakes contested for or be entitled to or receive any portion thereof, and that the commission shall have power to prescribe the rules, regulations, and conditions under which races shall be conducted.

As to the granting of licenses, it provides that they shall be granted annually; that they shall be for the term of one year; that they shall be granted if in the judgment of the commission a proper case for issuance of the license is shown; that they shall contain a condition that all races shall be subject to the rules, regulations, and conditions from time to time prescribed by the commission; that they shall be revocable by the commission for any violation thereof or whenever the continuance therof shall be decided not conducive to the interest of legitimate racing; that, if the commission refuses or revokes a license, it shall publicly state the reasons for so doing in full in its minute book, which shall at all times be subject to inspection upon application of any one; and that said finding shall be subject to the review of a "court of competent jurisdiction." It would seem that

the commission has power, not only to grant licenses, but that it has power also to assign and fix the dates at which the races shall be run under the license, which two powers need not be exercised simultaneously, but may be exercised successively, in which case, however, the power to assign and fix dates shall be exercised subsequent to the exercise of the power to grant the license. There is no express provision to this effect. If it has such power it is to be implied from the proviso of section 3, the second of the two court review clauses which the act for some reason contains, whereby it is provided that, not only the refusal of the commission to grant a license or its revoking a license shall be subject to the review of the courts of the state, but also that a refusal to assign any racing association at least 40 days in each year if desired for racing by such association shall be subject to like review. If the act is construed as conferring such power in addition to the power of granting licenses, then, of course, the act prohibits the running of races by an association having a license at any other time than the dates assigned by the commission.

It is provided that at least three of the commissioners shall be breeders and raisers of thoroughbred stock, and that no two of them shall be members of the same association; that they shall hold their offices for the term of four years; that they shall have a secretary to be paid a salary of not exceeding $1,200 per annum by the several racing corporations or associations as apportioned amongst them by the commission; that the commission shall biennially make report to the Legislature of its proceedings, embodying therein such suggestions and recommendations as it shall deem desirable. It is further provided that every running race meeting except as allowed by the act shall be a public nuisance, and every person acting or aiding therein shall be subject to a certain penalty, and that the commission may obtain an injunction against such unauthorized racing in a suit brought for that purpose in the circuit court of the county where it is proposed to conduct it.

The emergency stated for the act's going into effect at once is this:

"There is no general law regulating racing in this commonwealth, and it is desirable that one should be in operation as soon as possible."

The appellant Charles F. Grainger is president of the New Louisville Jockey Club, a racing corporation owning a race track for running horses adjoining Louisville, which it has operated for over 30 years continuously, and a member of the American Turf Association, a national organization of associations engaged in operating race tracks for running horses. None of the other appellants seems to be a member of a racing association. The commission organized April 18, 1906, by the election of Col. J. P. Chinn, who had introduced the act into the Legislature and thus given it its name, to wit, the Chinn Act, as president, and A. B. Rouse, as secretary. On the same date a license was granted to the Kentucky Racing Association of Lexingon, and from April 23, to May 1, 1906, inclusive, was assigned to it as dates for racing. On April 23, 1906, at a subsequent meeting of the commission, certain rules for the government of the commission were adopted; said New Louisville Jockey Club applied orally for a license and the

assignment to it of May 2, to May 23, 1906, inclusive, as racing dates, submitting therewith a list of the racing officials at said meeting, which application was granted; the Latonia Jockey Club, owner and operator of a race track for running horses at Covington, Ky., opposite Cincinnati, Ohio, and a member also of said American Turf Association, applied orally for a license and the assignment to it of May 30, to July 4, 1906, inclusive, submitting therewith a list of the names of the racing officials at said meeting, which application was granted; and the appellee, Douglas Park Jockey Club, which was a member of the Western Jockey Club, a national association in rivalry with said American Turf Association, applied by written communication for the assignment of May 12, to June 15, 1906, inclusive, to it as racing dates, which application was thereupon refused on the ground, as stated in the minutes of the commission, "that the dates asked for by said Douglas Park Jockey Club had previously been assigned."

Either at this meeting or at the previous meeting there was adopted a resolution to the effect that all associations making application for license shall give the names of the officers thereof, and, when making application for racing dates, shall submit the names of the racing officials of the meeting, and also a form of license. The form so adopted provides that the license is to hold race meetings at such times as the commission shall assign and fix, and upon condition that the licensee shall permit all owners and trainers not ruled off or suspended for fraud by a recognized meeting to race over its course subject to the general rules of racing; that no racing official shall act at its meeting except by approval of the racing commission; that all races shall be subject to the rules and regulations and conditions from time to time prescribed by the commission, and shall be revocable by the commission for any violation thereof or whenever the continuance of the license shall be deemed by the commission not conducive to the best interests of legitimate racing.

It is to be noted that the application of the appellee, the Douglas Park Jockey Club, was not for the granting of a license, but for an assignment of certain dates, and it seems never to have made an application for a license; and, further, that with its application it did not give or submit the names of its officers or of the racing officials at its proposed meeting. However, the Lexington Racing Association seems not to have given or submitted the names of either, and the New Louisville Jockey Club and the Latonia Jockey Club seem not to have given the names of the officers of the corporations in connection with their respective applications, and it is uncertain whether the resolution calling for the giving and submission of said names was adopted prior to any of said applications.

After the refusal of the appellants acting as said commission to grant said appellee's said application, the suit in the lower court was brought. The relief sought was an injunction against appellants restraining them from asserting that the appellee did not have the right, and would not be permitted, to have running races for stakes on its race track from June 2, 1906, to July 7, 1906, inclusive, a different period of time from that covered by its said application, from en-

forcing said act against it and instituting actions civil or criminal under said law, and from in any manner interfering with the operation, conduct, or management of its race track. The ground upon which said relief was sought was that said act was unconstitutional. It was claimed to be in violation of both the state and federal Constitutions. No further reference need be made, however, to the claim as to the state Constitution. It was claimed to be in violation of the tenth section of article 1 of the federal Constitution and of the fourteenth amendment thereto. The basis of the claim as to said tenth section was an allegation that prior to the passage of the law appellee had entered into contracts with a large number of persons skilled in the management and conduct of race meetings to conduct, operate, and manage said race meeting, the obligation whereof was impaired thereby. The ground upon which said act was claimed to be in violation of the fourteenth amendment was that it deprived it of its liberty and property without due process of law and denied it the equal protection of the laws, in that it made its right to operate its race track at all and the time when it should operate it to depend on the arbitrary determination of the commission, and had no application at all to corporations or associations organized to operate race tracks for trotting horses and fair associations.

The case was heard in the lower court upon bill, answer, and affidavits. It assumed, without deciding, that the act in question was constitutional, but held that the action of the commission was in violation of the fourteenth amendment. The order of injunction contained two provisions. In one the appellants were enjoined from instituting or instigating any proceedings against appellee under said act with reference to any running race meetings held by it between the date of order and December 1, 1906, and from in any manner interfering or causing others to interfere with its operation, conduct, and management of its track. In the other the appellants were enjoined from refusing to grant the appellee a license in due form to hold one or more race meetings as authorized by said act at any time or times it might elect between the date of the order and December 1, 1906. This latter provision was a mandatory injunction and in effect commanded appellants to grant appellee a license under the act permitting it to run such races as it pleased on its track up until December 1, 1906, without applying to appellee for an assignment of dates. The court seems to have been of the opinion that the sole power conferred on the commission was to grant licenses and prescribe general rules to govern the running of races thereunder, and that it had no power in relation to the assignment of dates.

These two provisions of the order are hardly consistent with each other, and the first one is hardly consistent with the view that the act is constitutional. The first one, which restrains appellants from taking any steps against appellee for operating without a license, presupposes that appellee does not need a license, and hence that the act is unconstitutional. The second one in effect commands the appellants to grant appellee a broad license. It presupposes that appellee does need a license and that the act is constitutional. The relief covered by the first provision is the only specific relief sought in the bill. That

covered by the second is not specifically prayed for, and, to say the least, it is doubtful whether it is in accordance with appellee's theory of its case as presented in the bill. Each provision will be considered separately and in its order.

The first one, as stated, presupposes that said act is unconstitutional, and appellee so contends here. It contends that it is in violation of the fourteenth amedment to the federal Constitution. It makes no point as to the tenth section of the first article thereof. It claims that it is in violation of both of the last two clauses of the first section of the amendment. It deprives it of its liberty and property without due process of law, in that by its provisions it cannot operate its race track without a license and an assignment of dates from the commission. This affects its liberty of action and depreciates the value of its property. It denies it the equal protection of the laws, in that it confers arbitrary power on the commission in the matter of granting licenses and assignment of dates and has no application to owners of race tracks for trotting horses or to state, county, or other fair associations holding not more than one meeting annually and for a period not exceeding six days for such meeting. It cites in support of its contention the following decisions of the Supreme Court, to wit: Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; Gulf, C. & S. F. R. Co. v. Ellis, 165 U. S. 162, 17 Sup. Ct. 255, 41 L. Ed. 666,; Cotting v. Godard, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679; Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169; Lochner v. New York, 198 U. S. 64, 25 Sup. Ct. 539, 49 L. Ed. 937.

In those cases the following statutes and ordinances were held to be in violation of said clauses of said amendment: In the Yick Wo Case the San Francisco ordinance forbidding any one to carry on the laundry business within the limits of the city without first obtaining the consent of the board of supervisors, except the same be located in a building constructed either of brick or stone; in the Gulf, C. & S. F. R. Co. Case, the Texas statute imposing an attorney's fee not exceeding $10 in addition to costs upon railway corporations omitting to pay certain claims within a certain time after presentation; in the Cotting Case, the Kansas statute limiting the charges to be made by the Kansas City Stock Yards Company for services to be rendered; in the Connolly Case, the Illinois statute prohibiting a recovery of the price of articles sold by any trust or combination formed in violation thereof, exempting agricultural products and live stock in the hands of the producer or raiser; in the Dobbins Case, the Los Angeles ordinance prohibiting the erection and maintenance of gas works except within certain limits; and, in the Lochner Case, the New York statute restricting the hours of employment in bakeries to 60 hours a week and 10 hours a day.

Main reliance is placed on the last clause of the first section or the equality clause of the amendment, and particular stress is laid on the words of Mr. Justice Matthews in the Yick Wo Case, to wit:

"When we consider the nature and theory of our institution of government, the principles upon which they are supposed to rest, and review the history of

their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary action."

Of which words Mr. Justice Brewer, in the Gulf, C. & S. F. R. Co. Case, said:

"No language is more worthy of frequent and thoughtful consideration."

It is to be noted in this connection that the question whether said act confers arbitrary power is not to be determined by the fact that the power conferred may have been exercised arbitrarily as to the appellee. If such is the case, possibly it may have some bearing on the interpretation of the power conferred. In the Yick Wo Case Mr. Justice Matthews seems to intimate that the arbitrary action of the board of supervisors complained of therein did have an interpreting effect on the nature of the power conferred. But we think Judge Sawyer struck a true note, in the case of Ex parte Christensen (C. C.) 43 Fed. 243, 247, when he said:

"The validity of an ordinance must be determined by its terms, by what it authorizes, not by the manner of its execution. It is valid or invalid irrespective of the manner in which it is in fact administered. Its capability of being abused is the test."

And, in the case of Williams v. Mississippi, 170 U. S. 214, 18 Sup. Ct. 583, 42 L. Ed. 1012, it was held that the equal protection of the laws is not denied to colored persons by the Constitution and laws of Mississippi, which make no discrimination against the colored race in terms, but grant a discretion to certain officers which can be used to the abridgment of the rights of colored persons to vote and serve on juries, when it is not shown that their actual administration is evil, but only that evil is possible under them.

But, in order to reach a correct conclusion in this case, it will not do to confine our attention to the said decisions of the Supreme Court relied on by appellee. We should consider in connection therewith other decisions of that court in which certain statutes and ordinances were held not to be in violation of said amendment, as for instance the following, to wit: Slaughter House Cases, 83 U. S. 36, 21 L. Ed. 394; Northwestern Fertilizer Co. v. Hyde Park, 97 U. S. 659, 24 L. Ed. 1036; Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145; Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205; Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 32 L. Ed. 253; Crowley v. Christensen, 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620; N. Y. & N. E. R. Co. v. Bristol, 151 U. S. 567, 14 Sup. Ct. 437, 38 L. Ed. 269; Davis v. Massachusetts, 167 U. S. 43, 17 Sup. Ct. 731, 42 L. Ed. 71; Gundling v. Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725; L'Hote v. New Orleans, 177 U. S. 595, 20 Sup. Ct. 788, 44 L. Ed. 899; Booth v. Illinois, 184 U. S. 426, 22 Sup. Ct. 425, 46 L. Ed. 623; Otis & Gasman v. Parker, 187 U. S. 606, 23 Sup. Ct. 168, 47 L. Ed. 323; Fischer v. St. Louis, 194 U. S. 361, 24 Sup. Ct. 673, 48 L. Ed. 1018; Jacobson v. Massachusetts, 197 U. S. 11, 25 Sup. Ct. 358, 49 L. Ed. 643; Lieberman v. Van De Carr, 199 U. S. 552, 26 Sup. Ct. 144, 50 L. Ed. 305.

The statutes and ordinances upheld in them are as follows, to wit: In the Slaughter House Cases, the Louisiana statute granting to the Crescent City Live Stock, Landing & Slaughter House Company the exclusive privilege of establishing and maintaining landing places, stock yards and slaughter houses in the city of New Orleans, at which all stock intended for sale or slaughter in said city should be landed, inclosed, and slaughtered; in the Northwestern Fertilizer Company Case, the Hyde Park ordinance prohibiting the transportation of offal or other offensive or unwholesome matter through said village and any person from carrying on any offensive or unwholesome business within the village limits or within one mile thereof; in the Barbier and Soon Hing Cases, the San Francisco ordinance prohibiting any one from carrying on the laundry business within certain prescribed limits of the city without first obtaining certain certificates from the health officer and board of fire wardens and not at all between the hours of 10 o'clock at night and 6 o'clock in the morning; in the Mugler Case, the Kansas statute prohibiting the manufacture and sale of intoxicating liquors; in the Powell Case, the Pennsylvania statute prohibiting the manufacture and sale of oleomargarine; in the Christensen Case, the San Francisco ordinance requiring a license for the sale of intoxicating liquors and wines, and providing that no license should be issued without the written consent of the board of police commissioners or in the event of their refusal without the recommendation of 12 citizens of the city owning real estate in the block or square in which the business was to be carried on; in the N. Y. & N. E. R. Co. Case, the order of the Connecticut railroad commisioners requiring the removal of a certain grade crossing on said company's line at its own expense; in the Davis Case, the Boston ordinance prohibiting any person from making any public address on any public grounds without a permit from the mayor; in the Gundling Case, the Chicago ordinance prohibiting the sale of cigarettes without a license and conferring on the mayor power to grant a license and requiring him so to do if the applicant was of good character and reputation and a suitable person to be intrusted with their sale, determinable from certain evidence in regard thereto submitted to the board of health and certified with its opinion to him with the application; in the L'Hote Case, the New Orleans ordinance prohibiting women of lewd character from dwelling outside of certain limits of the city; in the Booth Case, the Illinois statute prohibiting options to buy or sell grain or other commodities at a future time; in the Otis & Gasman Case, the California constitutional provision prohibiting all contracts for sales of shares of corporate stocks on margin; in the Fischer Case, the St. Louis ordinance forbidding the establishment or maintenance of a dairy or cow stable within the city limits without having received permission so to do from the municipal assembly; in the Jacobson Case, the Massachusetts statute providing for compulsory vaccination; and, in the Lieberman Case, the New York sanitary code provision enacted by the board of health, providing that no milk should be received, held, kept, sold, or delivered in said city without a permit in writing from the board of health and subject to the conditions thereof.

The points actually decided in the cases relied on by appellee and those we have referred to are of but little help to us in reaching a conclusion in this case. It is essential that we get behind them and grasp the fundamental principles which led to their decision. Or, to vary the metaphor, those principles having been congealed therein, we must restore them to their original fluid state and then let them carry or push us where they will.

In the first place, it is to be noted that a statute or ordinance depriving one of his liberty or property is not in violation of said amendment merely because of such deprivation. Either of three things is essential to bring the deprivation within the amendment. It must have no real or substantial relation to the public welfare, or the deprivation it provides for must be a deprivation without due process of law, or it must amount to a denial of the equal protection of the laws. If the statute or ordinance has a real and substantial relation to the public welfare, if it provides for a deprivation by due process of law, and if it affords an equal protection of the laws, it is valid, notwithstanding its enforcement will deprive a person subject thereto of his liberty or property. In the Slaughter House Cases, the ordinance upheld required the closing of all existing stock landings, stock yards, and slaughter houses; in the Northwestern Fertilizer Company Case, the ordinance upheld ruined the business of that company and rendered its plant valueless for the purpose for which it was erected; in the Mugler Case, the statute upheld required the abatement of all existing distilleries and breweries as nuisances and was enforced therein as to a brewery owned by one of the parties thereto; in the Powell Case, by reason of the statute upheld therein the owner of a large quantity of oleomargarine was denied the right to sell it within the jurisdiction thereof; and, in the N. Y. & N. E. R. Co. Case, the order of the railroad commissioners upheld required the removal of the dangerous railroad crossing at the expense of the railroad company. In the L'Hote Case, Mr. Justice Brewer said:

"The truth is that the exercise of the police power often works pecuniary injury, but the settled rule of this court is that the mere fact of pecuniary injury does not warrant the overthrow of legislation of a police character."

The Jacobson Case, in which the Massachusetts compulsory vaccination statute was upheld, affords a recent instance of a holding that the effect of a police statute on one's liberty is no reason for overthrowing it. Mr. Justice Harlan said therein:

"In every well-ordered society charged with the duty of conserving the safety of its members, the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraints, to be enforced by reasonable regulations, as the safety of the general public may demand."

It is true that he said further therein as follows:

"It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree. We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judi-

ciary would not be competent to interfere and protect the health and life of the individual."

But this is no qualification of our position. A statute so intended would in so far have no real or substantial relation to the public welfare. Indeed, each one of the cases which we have referred to, in addition to those cited and relied on by appellee, is an illustration of the proposition we have laid down. In each case the statute or ordinance upheld deprived some person or persons of their liberty or property, and it was upheld because either it did have, or it could not be said that it did not have, a real or substantial relation to the public welfare and also complied with the requirements as to due process of law and equal protection of the laws. The cases emphasized are simply striking cases of such deprivation. The deprivation, then, which the amendment has in view is not any deprivation, but a deprivation that has no real or substantial relation to the public welfare or that is brought about without due process of law or that amounts to a denial of the equal protection of the laws.

Again, a statute or ordinance depriving one of liberty or property does not amount to a denial of the equal protection of the laws because it does not apply to all persons within the jurisdiction of the legislative body enacting it, but is applicable only to certain of such persons. A legislative body has a right to discriminate amongst those persons and to limit the application of its laws to a portion of them only. The act of so discriminating is usually termed classification. There is, however, a limit to its right to discriminate and to classify, and it is important to understand exactly what that limitation is. It is frequently said that the classification must embrace all persons similarly situated. In the Barbier Case, Mr. Justice Field said:

"Though, in many respects necessarily special in their character, they [statutory regulations] do not furnish just ground of complaint if they operate alike on all persons and property under the same circumstances and conditions. Class legislation discriminating against some and favoring others is prohibited, but legislation which in carrying out a public purpose is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

There can be no doubt as to the correctness of this test as to the validity of any particular classification. The danger with it is that it may lead one to use an incorrect test, to wit, that the classification embraces all persons engaged in the same business. In the Powell Case, Mr. Justice Harlan said:

"The objection that the statute is repugnant to the clause of the fourteenth amendment forbidding the denial by the statute to any person within the jurisdiction of the equal protection of the laws is untenable. The statute places under the same restrictions and subjects to like penalties and burdens all who manufacture or sell or offer for sale or keep in possession to sell the articles embraced in its prohibitions, thus recognizing and preserving the principle of equality amongst those engaged in the same business."

Usually all persons engaged in the same business may be said to include all persons similarly situated, but not always; and in such cases that the classification embraces all persons engaged in the same business is not a correct test as to its validity. This happened in the

Gulf, C. & S. F. R. Co. Case. There the statute involved imposed an attorney's fee in certain cases on all railroad corporations, and yet it was held invalid.

Sometimes the test made use of is that the classification must be reasonable, and not arbitrary. In the Otis & Gasman Case, Mr. Justice Holmes said:

"The circumstances disclose a reasonable ground for classification."

In the Gulf, C. & S. F. R. Co. Case, Mr. Justice Brewer said:

"Arbitrary selection can never be justified by calling it classification."

In the same case he quoted from the opinion of Judge Black, in the case of State v. Loomis, 115 Mo. 307, 314, 22 S. W. 350, 21 L. R. A. 789, these words:

"Classification for legislative purposes must have some reasonable basis upon which to stand. It must be evident that the differences which will support class legislation must be such as in the nature of things furnish a reasonable basis for separate laws and regulations."

There can be no doubt also as to the correctness of this test. The only thing against it is its generality. One is in danger of losing himself in the terms "reasonable" and "arbitrary."

The Gulf, C. & S. F. R. Co. Case brought to the surface a still other and, as we deem it, the best test for determining the validity of a given classification. It is this: There must be a real and substantial relation between the classification and that for which the statute or ordinance making it was enacted—the object which it was intended to accomplish, to wit, the public welfare. Just as a deprivation of liberty or property to be valid must have a real and substantial relation to the public welfare, so a classification to be valid also must have such a relation thereto. In the Gulf, C. & S. F. R. Co. Case, Mr. Justice Brewer said:

"It is said that it is not within the scope of the fourteenth amendment to withhold from the states the power of classification, and that if the law deals alike with all of a certain class it is not obnoxious to the charge of a denial of equal protection. This as a general proposition is undeniably true. It is equally true that such classification cannot be made arbitrarily. There are distinctions which do not furnish any proper basis for the attempted classification. That must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed."

And again:

"The mere classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment. That in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification and is not a mere arbitrary selection."

In the case of Atchison, T. & S. F. R. Co. v. Matthews, 174 U. S. 104, 19 Sup. Ct. 612, 43 L. Ed. 909, Mr. Justice Brewer said:

"On the other hand, it is also true that the equal protection guarantied by the Constitution forbids the Legislature to select a person natural or artificial and impose upon him burdens and liabilities which are not cast upon others similarly situated. It cannot pick out one individual or one corpora-

tion and enact that whenever he or it is sued the judgment shall be for double damages or subject to an attorney's fee in favor of the plaintiff, when no other individual or corporation is subjected to the same rule. Neither can it make a classification of individuals or corporations which is purely arbitrary and impose upon such class special burdens and liabilities. Even where the selection is not obviously unreasonable and arbitrary, if the discrimination is based upon matters which have no relation to the object sought to be accomplished, the same conclusion of unconstitutionality is affirmed."

Here the test that the classification must embrace all persons similarly situated, and the test that it must have relation to the object sought to be accomplished, are both referred to. Probably as good a general rule to guide one in passing on the validity of a particular classification as can be found is that contained in these words of Judge Sullivan, in the case of State v. Farmers' Irr. Co., 59 Neb. 4, 80 N. W. 53:

"Classification to be valid must rest upon some reason of public policy, some substantial difference of situation or circumstances that would naturally suggest the justice or expediency of diverse legislation with respect to the objects classified."

Though, as heretofore indicated, a classification which embraces all persons engaged in the same business will not always be valid, yet generally it will. Most always it will embrace all persons similarly situated and will have a real and substantial relation to the object intended to be accomplished, to wit, the public welfare. It follows, therefore, that a classification of persons according to business may be a valid classification. In the Northwestern Fertilizer Co., Mugler, Powell, and Booth Cases the legislation upheld applied only to persons engaged in the same business and embraced all who were or might be engaged therein. They were forbidden to engage therein or to continue to carry them on. Those businesses were the manufacture and sale of offensive materials, of intoxicating liquors and oleomargarine, and the sale of options. The object intended to be accomplished by said legislation was the stoppage of the evils growing out of those businesses. Those particular evils grew out of those businesses, and none other. Hence a classification according to businesses in such cases was held valid. It had a real and substantial relation to the object intended to be accomplished, to wit, freedom from those evils or the public welfare. So a classification of persons according to particular branches of a business, i. e., that turn on such branches may be valid. In the Barbier and Soon Hing Cases, the ordinances upheld, forbidding the carrying on of the laundry business between the hours of 10 at night and 6 in the morning, applied to those engaged in washing and ironing, but not to those engaged in fluting, polishing, bluing, and wringing. Mr. Justice Field said:

"It is not discriminating legislation in any invidious sense that branches of the same business from which danger is apprehended are prohibited during certain hours of the night, whilst other branches involving no such danger are permitted."

In the Otis & Gasman Case, the statute upheld forbade contracts for sale of shares of corporate stock on margin, and not contracts for such sales of other articles. Mr. Justice Holmes said:

"With regard to the objection that this provision strikes at only some, not all, of the objects of possible speculation, it is enough to say that probably in California the evil sought to be stopped was confined in the main to stocks in corporations. California is a mining state, and mines offer the most striking temptation to people in a hurry to get rich. Mines generally are represented by stocks. Stock is convenient for purposes of speculation because of the ease with which it is transferred from hand to hand as well as for other reasons. If stopping the purchase and sale of stocks on margin will stop the gambling which it was desired to prevent, it was proper for the people of California to go no farther in what they forbade. The circumstances disclose a reasonable ground for the classification."

So a classification of persons according to equipment to carry on a particular business as determined by administrative officers to whom the matter is committed may be valid. In the Barbier and Soon Hing Cases, the ordinance upheld forbade any person from carrying on the laundry business without first obtaining a certificate from the health officer that his premises were properly and sufficiently drained, and that all proper arrangements had been made to carry on the business without injury to the sanitary condition of the neighborhood; and also one from the board of fire wardens that his washing and ironing apparatus was in good condition, that their use was not dangerous to the surrounding property from fire, and that all proper precautions were taken to comply with the provisions of the ordinance in relation to fire limits.

So a classification of persons according to their personal fitness to carry on a particular business as so determined may be valid. In the Yick Wo Case, Mr. Justice Matthews said:

"The ordinance therefore also differs from the not unusual case where discretion is lodged by the law in public officers or bodies to grant or withhold licenses to keep taverns or places for the sale of spirituous liquors and the like, when one of the conditions is that the applicant shall be a fit person for the exercise of the privilege, because in such cases the fact of the fitness is submitted to the judgment of the officer and calls for the exercise of a discretion of a judicial nature."

In the Gundling Case, the ordinance upheld forbade any person from carrying on the business of selling cigarettes without first obtaining a license from the mayor, granted after a determination that he was of good character and reputation and a suitable person to be intrusted with their sale, based upon certain evidence in regard thereto submitted to the board of health and certified with its opinion to the mayor. Mr. Justice Peckham said:

"In the case at bar the license is to be issued if the mayor is satisfied that the person applying is of good character and reputation and a suitable person to be intrusted with the sale of cigarettes, provided such applicant will file a bond as stated in the ordinance. * * * The mayor is bound to grant a license to every person fulfilling these conditions, and thus the fact of fitness is submitted to the judgment of the officer, and it calls for the exercise of a discretion of a judicial nature."

So a classification of persons according to personal fitness and equipment both as so determined may be valid. In the Lieberman Case, the sanitary code provisions upheld forbade all persons from receiving, holding, keeping, selling, or delivering milk in New York City without a permit in writing from the board of health. As to the authority

conferred on the board of health, Mr. Justice Day said that it was "to issue or withhold permits in the honest exercise of a reasonable discretion." It appears from the sanitary code containing the provision so forbidding, more particularly set forth in report of the same case in 175 N. Y. 444, 67 N. E. 913, that the discretion was to be exercised mainly in view of equipment, but no doubt also of personal fitness and past history.

And so also a classification of persons according to certain reasonable considerations as so determined may be valid. In the Fischer Case the ordinance upheld forbade the erection of a dairy or cow stable except by permission of the municipal assembly. Mr. Justice Brown said:

> "We do not regard the fact that permission to keep cattle may be granted by the municipal assembly as impairing in any degree the validity of the ordinance or as denying to the disfavored dairy keepers the equal protection of the laws. Such discrimination might well be made where one person desired to keep 2 cows and another 50; where one desired to establish a stable in the heart of the city and another in the suburbs; or where one was known to keep his stable in a filthy condition and another had established a reputation for good order and cleanliness. Such distinctions are constantly made the basis for licensing one person to sell intoxicating liquors and denying it to others. The question in each case is whether the establishment of a dairy and cow stable is likely in the hands of the applicant to be a nuisance or not to the neighborhood and to imperil or conduce to the health of its customers. As the dispensing power must be vested in some one, it is not easy to see why it may not properly be delegated to the municipal assembly which enacted the ordinance. Of course, cases may be imagined where the power to issue permits may be abused and the permission accorded to social or political favorites and denied to others who for reasons totally disconnected with the merits of the case are distasteful to the licensing power. No such complaint, however, is made to the practical application of the law in this case, and we are led to infer that none such exists. We have no criticism to make of the principle of granting a license to one and denying it to another, and are bound to assume that the discrimination is made in the interest of the public and upon conditions applying to the health and comfort of the neighborhood."

In all those cases where the right to carry on a particular business was made dependent on the determination of administrative officers as to equipment, personal fitness, past history, or other reasonable considerations, though such determination is made the basis of the classification, in reality the true basis thereof is the matter of equipment, personal fitness, past history, or other reasonable considerations; the commitment of the determination thereof to such officers being the only practical way of meeting such a situation.

But a classification can be made that approaches nearer to the arbitrary line than any yet considered—cases where the choice of the legislative body or of administrative officers to whom the matter is committed is the sole basis of the classification. Of course, in such cases even it is not to be supposed that the choice is made or to be made arbitrarily but only in view of all relevant considerations, and yet it is a choice that cannot be questioned when made. Such are cases where the power to limit the number of persons who may carry on a certain business or the place where it may be carried on exists. It is conceivable that the public welfare may re-

quire such a limitation, and, of course, if this is so power to make it resides in the legislative body. Where this is so power to choose the persons or place must also exist. If it does not, there can be no power to limit. Either that power must go or with it must exist the power to choose or select. A case of this sort is to be found in the Slaughter House Cases. The statute upheld therein limited the territory within which the stock landing, stock yard, and slaughter house business could be carried on and conferred on the Crescent City Live Stock, Landing & Slaughter House Company the exclusive privilege of carrying on that business. It required that company to permit others desiring to do so, upon payment of certain charges, to land, yard, and slaughter their live stock at its landing, stock yard, and slaughter house, but it excluded every one else from the right to operate a landing yard and slaughter house. The welfare of the community required that this particular business should be restricted to a particular territory, and that but one person should be allowed to carry it on. Hence the Legislature had power to so restrict and allow, and with that power went the power also to select and choose the person who was to carry it on. The one power could not exist without the other. The two powers were inseparably bound together. If there was any error in the decision in that case, it was in holding that the right to carry on such business could be conferred on a single person. There could have been no error in holding that the Legislature had the power to select the person who should carry it on. Mr. Justice Field, in his dissenting opinion, took the position that, if the Legislature had power to select in that instance, it had the power to select the persons who should carry on all the ordinary avocations of life. But this did not follow. In most avocations there is no power to limit, and in the absence of power to limit there can be no power to select.

Another case of this sort is to be found in the L'Hote Case. There the ordinance upheld prohibited women of lewd character from dwelling outside of certain limits of the city of New Orleans. Certain persons living and owning property within those limits claimed that they were deprived of their property thereby, in that it was depreciated in value, and that they were denied the equal protection of the laws. Out of this claim that case arose. Mr. Justice Brewer said:

"Upon what ground shall it be adjudged that such restriction is unjustifiable, that it is an unwarranted exercise of the police power? Is the power to control and regulate limited only as to matter of territory? May that not be one of the wisest and safest methods of dealing with the problem? At any rate, can the power to so regulate be denied? But given the power to limit the location of these persons to certain localities and no one can question the legality of the location. The power to prescribe a limitation carries with it the power to discriminate against one citizen and in favor of another. Some must suffer by the establishment of any territorial boundaries. We do not question what is so earnestly said by counsel for plaintiffs in error in respect to the disagreeable results from the neighborhood of such houses and people, but, if the power to prescribe territorial limits exists, the courts cannot say that the limits shall be other than those the legislative body prescribes. If these limits hurt the present plaintiffs in error, other limits would hurt others. But clearly the inquiry as to the reasonableness or propriety of the limits is a matter for legislative consideration and cannot become the basis of judicial

action. The ordinance is an attempt to protect a part of the citizens from the unpleasant consequences of such neighbors. Because the legislative body is unable to protect all, must it be denied the power to protect any?"

These two cases were instances where the selection was made by the legislative body. Cases exist where the right to make the selection was conferred on administrative officers. In the Christensen Case, the ordinance upheld forbade the sale of intoxicating liquors or wines without a license to be granted upon the written consent of the board of police commissioners, or in the event of their refusal upon the written recommendation of 12 citizens of the city owning real estate in the block or square in which the business was to be carried on. Here the right to carry on this business depended upon the consent of said board or of said real estate owners. It could not otherwise be carried on. The classification which it made was based upon such consent. The requirement of such consent was not a whit less stringent than the requirement of the ordinance involved in the Yick Wo Case that one to carry on the laundry business in a frame building should have the consent of the board of supervisors. Of this requirement Mr. Justice Matthews had this to say:

"They seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent not only as to places but as to persons."

And again this:

"The power given them is not confided to their discretion in the legal sense of the word, but is granted to their mere will. It is purely arbitrary and acknowledges neither guidance nor restraint."

Yet the ordinance was upheld, notwithstanding that the ordinances involved in the Yick Wo Case were invalidated. The controversy over the ordinance involved in the Christensen Case arose first in the state courts, and the California Supreme Court upheld the ordinance. Ex parte Christensen, 85 Cal. 208, 24 Pac. 747. The court said:

"The objection is that this makes the license depend upon the arbitrary will and pleasure of the board of police commissioners in the first instance, and of the 12 property owners in the second, and the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, and other cases from the federal courts are cited. But whatever force this objection might have in reference to licenses to carry on the ordinary avocations of life, which are not supposed to have any injurious tendency, it has no force in the present case. It is well settled that the governing power may prohibit the manufacture and traffic in liquor altogether, provided only that it does not interfere with interstate commerce."

From the state courts the controversy was transferred to the federal courts by habeas corpus proceedings. The lower federal court held the ordinance invalid, feeling bound by the decision of the Supreme Court in the Yick Wo Case. Ex parte Christensen (C. C.) 43 Fed. 243. The distinction made by the Supreme Court of California was pressed upon Judge Sawyer, but he did not concur in it. He said:

"It is sought by counsel for the city, as was attempted by the state Supreme Court, to distinguish this case from the laundry ordinance case cited, on the ground that the laundry business is a necessary business, and cannot be wholly suppressed, but only regulated, for the purposes of securing safety from fires,

while selling liquor is supposed to be injurious to society per se, and may be wholly prohibited or permitted upon such conditions as may be prescribed: that the power to absolutely prohibit necessarily includes the power to impose any terms or conditions, however arbitrary, no matter what, less than absolute prohibition, and, consequently, that the power to grant or refuse a license may be delegated to the arbitrary and unregulated will of one or more persons, official or unofficial. I cannot, as at present advised, assent to this proposition. This ordinance does not limit or regulate, or propose to limit or regulate, the sale of liquors. It would seem to be upon its face, like other license ordinances, a mere revenue measure. It does not prohibit the sale of liquors, or limit their sale to any particular portion of the city, or to any number of persons, nor prescribe any qualifications whatever which shall be necessary to entitle a party to a license, or prescribe any conditions or characteristics which shall constitute a disqualification and debar one from obtaining a license. It is not a matter of regulation at all. It simply provides that no license shall issue to any party unless he obtain the written consent of a majority of the police commissioners, or of 12 property holders in the same block, without indicating any conditions whatever upon which the assent may or ought to be given, or withheld. It leaves it to the absolute, arbitrary, unregulated will of the persons named. They can consent to grant a license to every vagabond and disreputable person in the city, and refuse to consent to a license to every respectable person in the city. The ordinance permits and authorizes such action. It puts it in the absolute, arbitrary power of these persons to control the whole retail liquor trade of the city, without regard to qualifications of the parties seeking a license, or to circumstances or conditions, or the interests of society. In my judgment, an ordinance that upon its face permits and authorizes such discrimination and inequality of operation is a violation of the Constitution of the United States. I admit the full power of the state to prohibit, limit, and control the domestic liquor traffic, and to prescribe the qualifications and conditions applicable to all of those who are to be permitted to sell liquors, but this is a very different proposition from that which claims the authority to confer upon any one or more persons the arbitrary power, in accordance with their uncontrolled will, to regulate these matters."

On appeal to the Supreme Court, Judge Sawyer's decision was reversed. Crowley v. Christensen, supra. Mr. Justice Field does not in his opinion controvert the position taken as to the nature of the power conferred and seemingly assumes that it was of the same nature as that conferred by the laundry ordinance involved in the Yick Wo Case. He distinguished these two cases in these words:

"It will thus be seen that that case was essentially different from the one now under consideration: the ordinance there held invalid vesting uncontrolled discretion in the board of supervisors with reference to a business harmless in itself and useful to the community, and the discretion appearing to have been exercised for the express purpose of depriving the petitioner of a privilege that was extended to others. In the present case the business is not one that any person is permitted to carry on without a license, but one that may be entirely prohibited or subjected to such restrictions as the governing authority of the city may prescribe."

Again, he said:

"If there were no property holders in the block, the discretionary authority would be exercised finally by the police commissioners, and their refusal to grant the license is not a matter of review by this court, as it violates no principle of federal law."

In the latter quotation he speaks of the power conferred as "discretionary authority," but, as indicated by what he says in the former quotation, the discretion he has in mind is an "uncontrolled discretion," the same discretion no doubt which Mr. Justice Matthews had in mind

when he used the words, "not a discretion to be exercised upon a consideration of the circumstances of the case." Possibly, in view of the decisions in the Fischer and Lieberman Cases, in the former of which the provision of the ordinance upheld was that no one should erect a dairy or cow stable except by permission of the municipal assembly, and in the latter of which the provision in the sanitary code upheld was that no one should sell milk without a permit in writing from the board of health, that the power conferred was a "reasonable discretion," it would not now be held that by an ordinance similar to the one involved in the Christensen Case the power conferred was an "uncontrolled discretion." But, viewing it as an uncontrolled discretion, the ordinance was upheld because it related to a business which might be entirely prohibited or subjected to such restrictions as the governing authority of the city might prescribe.

Again, in the Davis Case, the ordinance upheld prohibited any person from making any public address on any public grounds without a permit from the mayor, and one was convicted in the state courts of speaking on Boston Common in violation of this ordinance. The Supreme Court of Massachusetts had held according to Mr. Justice White:

"That the Common was absolutely under the control of the Legislature, which in the exercise of its discretion could limit the use to the extent deemed by it advisable and could and did delegate to the municipality the power to assert such authority."

This absolute power over Boston Common in the municipality was held to include the power to prescribe that no one should speak thereon without the mayor's permit. Mr. Justice White said:

"The assertion that, although it be conceded that the power existed in the state or municipality to absolutely control the use of the Common, the particular ordinance in question is nevertheless void because arbitrary and unreasonable, in that it vests in the mayor the power to determine when he will grant a permit, in truth, whilst admitting on the one hand the power to control, on the other denies its existence. The right to absolutely exclude all right to use necessarily includes the authority to determine under what circumstances such use may be availed of, as the greater power includes the lesser."

In the case of Louisville Water Co. v. Wiemer, 130 Fed. 257, 64 C. C. A. 503, this court held that a regulation of a water company requiring persons engaged in the business of sprinkling streets to obtain a license from the company, and providing that more than one license would not be granted covering the same streets or part of a street, which should be granted to the applicant having the largest list of petitioning owners of abutting property, was reasonable and valid and upheld a selection made by the company under the regulation. Judge Severens said:

"Certainly it cannot be said that there would be any propriety in granting licenses to any and all comers who should demand to do the same thing. In this particular service it is obvious that this would lead to chaos, would embarrass the service to the public, and would be inconvenient and prejudicial to the company. We see nothing, therefore, that could be injurious to any lawful right of others in restricting the grant of the license to one person for a definite locality, so long as that person accomplished the duty of the company to the public in a proper way. The concession of this place to the

one who could bring the largest approval of those of the other party who were most interested seems fair."

It must therefore be conceded that a classification can properly be made on the basis of the choice or selection of the legislative body or of administrative officers to whom the matter is committed. As stated, it is not to be presumed in such cases that the choice or selection is made in the one instance or authorized to be made in the other without regard to such considerations as may be relevant thereto, and yet in fact it may be so made and have no effect upon the classification. This is so as to all businesses where the power to limit exists. Possibly it may not be so in all cases where the power to prohibit exists. Possibly the power to prohibit may not always include the power to limit. We are led to refer to this possibility in view of the Union Sewer Pipe Company Case. It would seem to be certain that the power to prohibit all trusts and combinations exists, and yet in that case a limited prohibition was held invalid. But certainly where the power to limit exists the power to select also exists.

This power to select in such cases may be likened to the power to appoint to office. As but one person can be appointed, the person having appointing power has the power of selection. Or it may be likened to the power to make grants of exclusive franchises. As but one grant can be made, the power to select the person to whom the grant shall be made necessarily exists. Such a classification in such cases has a real and substantial relation to the public welfare. The public welfare requires the limitation, and the limitation necessitates the selection. The touchstone, therefore, of the validity of legislation depriving one of his liberty or property or making a discrimination amongst the persons to whom it is applicable is the public welfare. If the deprivation or classification has a real and substantial relation thereto it is valid, otherwise it is not.

This brings us to another fundamental principle embodied in the decisions cited and referred to. It is this: A court has no right to invalidate or overthrow legislation depriving a person of his liberty or property or making a discrimination as to the persons to whom it is applicable simply because it believes to a certain degree that it has no real or substantial relation to the public welfare. Something more than this is required in order to warrant its interference. That something more is that it must be palpably clear that the legislation in question has no real or substantial relation thereto. The Legislature or local assembly acting under its authority is the governing body of the state or that portion thereof. It is its primary duty to determine what the public welfare demands, and every presumption must be indulged in its favor. It follows, therefore, that unless it is palpably clear that its determination is wrong it must be allowed to stand. Many quotations could be made in support of this position. Two will suffice. In the Gundling Case, Mr. Justice Peckham said:

"Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be and to what particular trade, business, or occupation they shall apply are questions for the state to determine, and their determination comes within the proper exercise of the police power by the state, and, unless

the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizens are unnecessarily and in a manner wholly arbitrary interfered with or destroyed without due process of law, they do not extend beyond the power of the state to pass, and they form no subject for federal interference."

And in the Booth Case, Mr. Justice Harlan said:

"The courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear and unmistakable infringement of rights secured by the fundamental law."

It would seem, therefore, that the New York Court of Appeals, in a holding in a certain case referred to with approval by Mr. Justice Field in his dissenting opinion in the Powell Case, did not put the matter right. That holding as stated by him was as follows:

"When a health law is challenged in the courts as unconstitutional, on the ground that it arbitrarily interferes with personal liberty and private property without due process of law, the court must be able to see that it has in fact some relation to the public health, that the public health is the end aimed at, and that it is appropriate and adapted to that end; and, as it could not see that the law in question * * * was designed to promote the public health, it pronounced the law unconstitutional and void."

Rather the court will not so pronounce a law, unless it is able to see that it will not promote the public welfare, and that beyond a reasonable doubt. And it would seem further that Mr. Justice Peckham, in the Lochner Case, did not put the matter exactly right, when he said:

"In every case that comes before this court, therefore, where legislation of this character is concerned, and where the protection of the federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable, and appropriate exercise of the police power of the state, or is it an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty."

Rather, is not the question that necessarily arises in such cases this: Is or not it palpably clear that the legislation in question is not a fair, reasonable, and appropriate exercise of the police power of the state, but is an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty?

If, then, in a given case the court must admit that it is possible for a reasonable man to conceive that the legislation in question may subserve the public welfare, it must leave it alone. As said by Mr. Justice Holmes, in the Otis & Gasman Case:

"While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a Constitution, instead of embodying only relatively fundamental rules of right as generally understood by all English speaking communities, would become the partisan of a particular set of ethical or economical opinions, which by no means are held semper ubique et ab omnibus."

And if, further, in a given case, the court must admit that it is possible for the Legislature to have known some fact not known to

it which would make the legislation in question conducive to the public welfare, it must keep its hands off. In the Powell Case, it was agreed that the oleomargarine which the defendant was charged with having for sale, a portion of which he sold, was in packages so marked as to let purchasers know that it was oleomargarine, and it appeared from the evidence offered and rejected that it was wholesome and nutritious, yet the statute and the conviction under it were upheld because it was conceived that it was possible that most kinds of oleomargarine in the market contained ingredients that were or might become injurious to health, a fact as to which the court could not take judicial knowledge, but might have been known to the Legislature and caused the passage of the law. But just here the caution of Mr. Justice Brewer, in the Gulf, C. & S. F. R. Co. Case, should be borne in mind. It is in these words:

"While good faith and a knowledge of existing conditions on the part of the Legislature is to be presumed, yet to carry that presumption to the extent of always holding that there must be some undisclosed and unknown reason for subjecting certain individuals and corporations to hostile and discriminating legislation is to make the protecting clause of the fourteenth amendment a mere rope of sand in no manner restraining state action."

A final fundamental principle embodied in said decisions which the proper disposition of this case requires should be taken note of is this: If legislation depriving one of his liberty or property or making a discrimination as to the persons to whom it is applicable does in fact have a real and substantial relation to the public welfare both so far as said deprivation and discrimination are concerned, the motive which prompted its enactment cannot be inquired into. In the Soon Hing Case, Mr. Justice Field said:

"The principal objection, however, of the petitioner to the ordinance in question is founded upon the supposed hostile motives of the supervisors in passing it. The petition alleges that it was adopted owing to a feeling of antipathy and hatred prevailing in the city and county of San Francisco against the subjects of the Emperor of China resident therein, and for the purpose of compelling those engaged in the laundry business to abandon their lawful vocation, and residence there, and not for any sanitary, police, or other legitimate purpose. There is nothing, however, in the language of the ordinance, or in the record of its enactment, which in any respect tends to sustain this allegation. And the rule is general, with reference to the enactments of legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile. And in the present case, even if the motives of the supervisors were as alleged, the ordinance would not be thereby changed from a legitimate police regulation, unless in its enforcement it is made to operate only against the class mentioned; and of this there is no pretense."

In the Dobbins Case, Mr. Justice Day said:

"It is urged that, where the exercise of legislative or municipal power is clearly within constitutional limits, the court will not inquire into the motives which may have actuated the legislative body in passing the law or ordinance in question. Whether when it appears that the facts would authorize the exercise of the power, the courts will restrain its exercise because of alleged wrongful motives inducing the passage of an ordinance is not a question necessary to be determined in this case; but, where the facts as to the situation and conditions are such as to establish the exercise of the police power in such manner as to oppress or discriminate against a class or an individual, the courts may consider and give weight to such purpose in considering the validity of the ordinance."

And, in the Lochner Case, Mr. Justice Peckham said:

"It is impossible for us to shut our eyes to the fact that many of the laws of this character, while passed under what is claimed to be the police power for the purpose of protecting the public health or welfare, are in reality passed from other motives. We are justified in saying so, when from the character of the law and the subject upon which it legislates it is apparent that the public health or welfare bears but the most remote relation to the law."

There is nothing in these statements of Mr. Justice Day and Mr. Justice Peckham inconsistent with that of Mr. Justice Field in the Soon Hing Case. All that they mean is that the courts have the right to consider the question whether any given legislation has a real or substantial relation to the public welfare, and, if they determine that it has not, they have the right to conclude that it was enacted, not for the public welfare, but for the purpose of depriving the persons affected by it of their liberty and property. In such a case the latter is the real motive behind the enactment, and the claim that it was the public welfare that led thereto is mere pretense. But, where it determines that such legislation does in fact have a real and substantial relation to the public welfare, they do not mean to intimate that the courts have the right to inquire into the real motives that brought about its enactment, and if they conclude that in fact it was not the public welfare, but some sinister motive that was at the bottom of it to overthrow it. Always, as is to be gathered from Mr. Justice Peckham's statement, the inquiry as to motive is limited to the character of the law and the subject upon which it legislates. It cannot go outside of that.

This completes our presentation of the fundamental principles embodied in the decisions of the Supreme Court we have added to those cited and relied on by appellee. There is nothing in the latter decisions qualifying in the slightest those principles. We have just directed attention to Mr. Justice Day's statement, in the Dobbins Case, and Mr. Justice Peckham's statement, in the Lochner Case, on the question of motive and shown their true bearing. In the Yick Wo Case, the ordinance involved made the discrimination it permitted to turn on the choice of the board of supervisors, a discretion not "to be exercised upon the circumstances of each case," but an "uncontrolled" discretion." There was no power to prescribe a limit as to how many persons should carry on the laundry business, and hence there could have been no power to select those who should carry it on. In the Gulf, C. & S. F. R. Co. Case, it was held that the classification of the statute involved therein, by which the attorney's fee imposed was

limited to railroad corporations, had no real or substantial relation to the public welfare. It was unreasonable and arbitrary and did not embrace all persons similarly situated. This was true also of the classification of the statute involved in the Cotting Case. It limited the charges alone of the Kansas City Stock Yards Company and omitted other companies engaged in the same business at the same place. The discrimination was attempted to be upheld by the circumstance that the other companies did a smaller business. But it was held that this was not a reasonable basis of classification and was purely arbitrary. Mr. Justice Brewer said:

"If once the door is opened to the affirmance of the proposition that a state may regulate one who does much business, while not regulating another who does the same but less business, then all significance in the guaranty of the equal protection of the laws is lost."

And likewise, of the classification of the statute involved in the Union Sewer Pipe Co. Case, it was held that the limitation of the application of its provisions to all sellers of articles outside of agriculturists and live stock dealers had no real or substantial relation to the public welfare. It did not apply to all similarly situated and was unreasonable and arbitrary.

Then, as to the Dobbins Case: The city of Los Angeles, on August 16, 1901, enacted an ordinance prescribing the limits within which gas works might be erected. Under this ordinance and a permit from the fire commissioners, Mrs. Dobbins had begun the erection of gas works and expended considerable money in doing so. Thereupon and whilst the erection of said works was in progress, to wit, on November 25, 1901, a little over three months after the enactment of said ordinance, said city enacted another ordinance narrowing the limits within which gas works might be erected, so as to exclude the place where said works were being erected. Within the original limits there was a large amount of vacant and unoccupied land, and it was devoted almost exclusively to manufacturing enterprises. It was held that the ordinance narrowing the limits had no real or substantial relation to the public welfare, and that the purpose of its enactment was to deprive Mrs. Dobbins of her property so that she might not compete with another gas company supplying the city with gas. In the Lochner Case, on the same ground, the statute limiting hours of labor in bakeries was invalidated. In all these cases it was held, not only that the statute or ordinance involved had no such relation to the public welfare, but that it was palpably clear that such was the case.

With this preliminary consideration of fundamental principles we are prepared to take up the act in question and determine its validity. At the outset, then, it must be conceded that there are two things which do not affect its validity and have no bearing whatever upon the determination thereof. One is the effect of the enforcement of the act on the liberty and property of the appellee. It is true that, when appellee acquired its property and made its investment, there was no restriction upon its right to operate a race track for running horses. It was a lawful business, and appellee had a right to conduct it as it chose, provided it did not infringe the rights of others. And it may be true

that an enforcement of said act may result in a material pecuniary loss to the appellee. Yet notwithstanding this the act is valid, if it is not palpably clear that it has no real or substantial relation to the public welfare.

The other thing is the motive which prompted its enactment. It is urged with some fervor that it was to prevent competition on the part of the Western Jockey Club's association, the appellee, with the American Turf Association's two associations, the New Louisville Jockey Club and the Latonia Jockey Club, during such dates as they desire to have race meetings, and particularly on the part of the appellee with the New Louisville Jockey Club, during its spring race meeting in May, which it has held at that time for over 30 years in succession; and possibly this may have had something to do with its enactment. The matters relied on to establish such motive are such as these: Prior to the enactment of said act, racing in Kentucky with running horses, it is said, had been in vogue for over 100 years without state regulation. It was not until appellee appeared on the scene that any attempt at such regulation was made. Again, in the ordinary course of things the act in question would not have gone into force until some time in June, after the time of said New Louisville Jockey Club's race meeting in May of this year had been held. There would not, therefore, in that contingency, have been anything to prevent appellee holding a race meeting at the same time and thus competing with said club. The ordinary course of things was not pursued, but an emergency clause was inserted in the act which made it take effect immediately upon approval of the Governor, and the only emergency stated was that there was no general law regulating racing in Kentucky, and it was desirable that one should be in operation as soon as possible. Again, the appellant Charles F. Grainger, one of the members of the commission, was at the time of his appointment and has been ever since president of said New Louisville Jockey Club, and said club's application for license and assignment of dates was made by M. J. Winn, president of said American Turf Association. And, finally, since the enactment of said act, nothing has been done practically of any substantial bearing that would not have been done had there been no act, except to prevent appellee from holding a race meeting that would compete with said American Turf Association's two clubs, said New Louisville Jockey Club and said Latonia Jockey Club.

Yet, notwithstanding such may have been the motive that prompted the enactment of said act, the act is valid if it is not palpably clear that the act has no real or substantial relation to the public welfare. The validity, then, of the act hangs upon but a single consideration. There is but one question to be answered in determining its validity. That question is this: Is it or not palpably clear that said act has no real or substantial relation to the public welfare? It is to be noted that the question is not: Does it or not have a real or substantial relation thereto? But: Is it or not palpably clear that it does not? This must be determined both as to the deprivation it authorizes and the classification it makes. In order to answer it correctly we must have in mind just what it provides in the way of deprivation and classification, and this is to be found in the powers it confers on the commission and the

exemptions it makes as to trotting horse and fair races. Apart from the power to prescribe the rules, regulations, and conditions under which running races shall be conducted in Kentucky, it confers on it the power to grant and to revoke licenses and to assign and fix dates at which race meetings under the licenses may be held. It is true that no express power is conferred to assign or fix dates unless it is included in the power to prescribe such rules, regulations, and conditions, as to which we have grave doubt. But we think it is to be implied from the second court review provision contained in the proviso of section 3, which provides that a refusal to assign dates for at least 40 days in each year shall be subject to court review, and the commission from the form of license adopted by it seems to have so construed the act.

The power to grant licenses is to be exercised when "in the judgment of the commission a proper case for issuance of" a license is shown. The power to revoke a license is to be exercised upon "any violation" of the rules, regulations, and conditions prescribed by the commission, or "whenever the continuance" of the license "shall be deemed by the commission not conducive to the interests of legitimate racing." There is nothing said as to the considerations that shall affect the commission in the matter of fixing dates. But, as the act in no other particular contemplates that the commission shall act otherwise than along reasonable lines, it would not seem that it contemplated that it should do so here. So that we must conclude that the power conferred on the commission in all particulars was to act "in the honest exercise of a reasonable discretion." That such is the case is made certain by the provision that the action of the commission in all three particulars was subject to court review. Its action has to stand the test of judicial criticism. It is suggested that the only review provided for in the matter of assignment of dates was of a refusal to assign at least 40 days in each year, and that no review was provided of a refusal to assign particular dates applied for—so that, if the commission assigned at least 40 days in each year, its action was final. This is the letter of the provision, but as it seems that it is the general intent of the act that in no particular should the commission's action be final, it is hardly its spirit. We need not, however, commit ourselves on this point. Even if it was intended that the action of the commission as to the assignment of particular dates applied for should be final, yet there is no reason to doubt that it was further the intent of the act that the action of the commission in regard thereto should be had "in the honest exercise of a reasonable discretion." And it may be conceded that it was still further its intent that in case two associations should apply for the same dates the commission should have power to assign the dates applied for to one and refuse them to the other. The room for the exercise of a reasonable discretion in such a contingency may be small, and it may tax one to indicate in advance possible considerations that might reasonably influence the commission in assigning the dates to one association rather than the other, yet it cannot be said that there are no such considerations, and that the commission would be left to the alternative of doing as it pleased or tossing a copper. Is it or not then palpably clear that the said act in whole or in part has no real or substantial relation to the public welfare? Appellee's real contention is

that said act, in that it exempts the operation of trotting and fair association race tracks from its provisions, and confines their application to the operation of running race tracks, and further in that as to the operation of running race tracks it confers on the commission the power to assign dates at which race meetings may be held, including as it does the power to choose between two associations owning such race tracks in the same or separate communities within the state as to which of them may hold a race meeting at any particular time, is out of such relation to the public welfare. It is therefore not the deprivation but the discriminating or classification feature of the act of which complaint is made. There are, as indicated, two particulars in which it has such feature, and it is claimed that in each particular the act has no real or substantial relation to the public welfare. We will dispose of the claim as to the last particular first, and, in so doing, we will assume that the claim as to the first particular is unsound. To do this correctly it is necessary that we understand how it is that legislation with reference to the operation of running race tracks can have relation at all to the public welfare of the state of Kentucky. It is in this way: The operation of such race tracks is a source of amusement to such of its people as enjoy running races. It may be, as contended by appellants, also the source of great material good in that large sums of money are invested in said state in thoroughbred horses, from which running horses are produced, and the operation thereof is essential to the maintenance of this industry. To what extent the operation of such race tracks contributes to the welfare of that state in these particulars it is not for us to say. Conceding that it does so to a material extent, it must be admitted that in certain particulars it is also detrimental thereto, mainly in one. As it is a matter of common knowledge, this court judicially knows that an invariable accompaniment of the operation of such race tracks is betting on the races there run. This betting is carried on upon the grounds by means of what is called book making, possibly also by pool selling, and otherwise. The betting induced thereby is not confined to the race tracks. It is carried on also in pool rooms away from the tracks; information of the results of the races being transmitted thereto by means of the telegraph. It is not necessary that we descant upon the demoralizing effect of such gambling on the communities where it is carried on, particularly of that carried on in pool rooms. It is known to all. That such pool rooms or betting away from the track exists, or at least has existed, in the state of Kentucky, we know from the decision of the Court of Appeals in the following cases, to wit: Cheek v. Comonwealth, 79 Ky. 359; Commonwealth v. Simond, 79 Ky. 618; Bollinger v. Commonwealth, 98 Ky. 574, 35 S. W. 553; Commonwealth v. Enright, 98 Ky. 635, 33 S. W. 1111.

In the Cheek Case, it was held that one who had sold pools upon horse races in a house under his control within the state had been guilty of the common-law offense of "keeping a disorderly house." In the Simond Case, it was held that one who had operated therein a machine known as "French Pool" or "Paris Mutual," used in betting on horse races, had been guilty of a violation of a statute of the

state prohibiting the operation of a "contrivance used in betting." And, in the Bollinger and Enright Cases, it was held that certain persons who had permitted persons to habitually assemble in houses under their control and there engage in betting on horse races had been guilty of the offense of maintaining a common nuisance. In the Bollinger Case, Judge Lewis said:

"And such gaming house is really more conducive of evil to the public morals than a race track, because those who assemble there are invited only by passion for gambling and cupidity."

In this expression it is recognized that a race track is a source of evil both in the gambling that is permitted there, and in that which is carried on in pool rooms; the evil in the latter particular being greater than that in the former. In its effect on this evil is one way at least then in which legislation with reference to the operation of running race tracks can have relation to the public welfare. And so great is that evil that there can be no doubt that legislation having the effect of prohibiting the operation thereof within the state of Kentucky entirely would be valid, notwithstanding it would put an end thereto as a source of amusement and might destroy entirely its thoroughbred horse industry. Such legislation would find support in the decision of the Supreme Court in the cases of Stone v. Mississippi, 101 U. S. 814, 25 L. Ed. 1079, and Douglas v. Kentucky, 168 U. S. 188, 18 Sup. Ct. 199, 42 L. Ed. 553, in which legislation abolishing lotteries was upheld, and, in the Booth and Otis & Gasman Cases, in which legislation abolishing dealing in options and sales of corporate stock on margins was upheld. Certainly legislation whose effect is not to abolish the operation of such race tracks, but to minimize this evil and other evils arising therefrom, has a real and substantial relation to the public welfare and is valid.

In the cases of State v. Roby, 142 Ind. 168, 41 N. E. 145, 33 L. R. A. 213, 51 Am. St. Rep. 174, State v. Forsythe, 174 Ind. 466, 44 N. E. 593, 33 L. R. A. 221, and Grannan v. West Chester Racing Association, 153 N. Y. 449, 47 N. E. 896, such legislation was upheld and treated as valid. The Indiana statute provided for no commission nor a license to operate a race track. It simply limited the time within which racing might be had. It could only be had between April 15th and November 15th in each year. Race meetings by any association could not be held oftener than three times a year and two times in any period of 60 days, nor longer than 15 days at a time, nor until after the full period of 30 days had elapsed after a meeting had been held. The New York statute provided for a commission and the granting of licenses to operate according to certain rules. The Indiana statute seems to apply to all race tracks, and the New York statute only to running race tracks.

Such is the character of the act in question. It has a tendency to minimize all evils arising from the operation of running race tracks. It limits the time within which they may be operated, to wit, between April 1st and December 1st in each year, between sunrise and sunset and for such length of time as the commission may determine. It requires a license to operate at all and provides for its revocation.

It authorizes the commission to prescribe the rules, regulations, and conditions under which racing may be had. In all these particulars, therefore, the act has real and substantial relation to the public welfare. But these are not the only particulars in which it has the tendency to minimize those evils. The power to assign dates for race meetings involves not only the power to limit their duration but the power to limit the number of associations within the state or in any given community that may operate during the same period of time, and even to limit to one association the right to operate its race track during any given period of time. The power to limit in this particular has a tendency to minimize those evils. The more associations that are operating their race tracks within the state, and particularly within the same community, during the same period of time, the greater the harm to the welfare of the state, and the less the number of associations that are so doing the less the harm. This is self-evident and needs no elaboration. It follows that this right of limitation involved in the power to assign dates has such relation to the public welfare and must be valid. If this is so, then the power to choose and select the associations or association that shall operate during any given period of time, involved also in the power to assign dates, also has such relation to the public welfare and must be valid. The power so to limit cannot exist without the power to choose or select. The fact that the power to limit has a real and substantial relation to the public welfare necessitates that the power to choose or select has such relation thereto.

We are driven then to the conclusion that the power to assign dates with all it involves has such relation to the public welfare and is valid. This is so even if the assignment of the commission of particular dates, and hence the power to choose or select is final and conclusive, and not subject to court review. Direct authority in support of this position is to be found in the decisions of the Supreme Court in the Slaughter House, Christensen, L'Hote, and Davis Cases and of this court in the Wiemer Case. This disposes of this portion of the discriminating or classification feature of the act in question. And in passing it is to be noted that, even if we are wrong here, it does not follow that the whole act is unconstitutional, that appellee is entitled to operate its track without a license, and that the first provision of the order appealed from is correct. It is possible to take the view that this portion of the act is invalid and the rest of it valid.

Then, as to the other portion of the discriminating or classification feature of said act, to wit, its application solely to associations operating running race tracks. Is it or not palpably clear that in so far it has no real and substantial relation to the public welfare; that in making the discrimination or classification in this particular the act does not have regard to the requirements of the public welfare? We think there can be no question that it is not. As stated, gambling is the invariable accompaniment of the running race track. It is allowed on the track and is carried on in pool rooms away therefrom. Those tracks are often operated by gamblers and always by those who encourage such gambling. The gambling so induced is a source of

great revenue to them in the sale of the book making or pool selling privileges and of the news privilege. They are operated, therefore, from a commercial standpoint. Possibly there may be some exception to this statement, but it is certainly correct in the main. Not infrequently said race tracks have been so operated as to create great scandal and to call forth attempts at their suppression. None of this can be said to be true of racing on fair association tracks. They are operated only once a year, usually not longer than a week at a time. Such betting as is allowed at them is not of the refined kind involved in book making or pool selling, and is not the source of demoralization. So far as pool rooms are concerned, they have no connection with such racing, as a rule at least. As to trotting race tracks this court does not know that any of the things said in regard to running race tracks are to any material extent true of trotting race tracks. Probably at times the races run on them are bet upon through book making and pool selling both on the track and in the pool rooms away therefrom, but to what extent this is so we do not know. Nor do we know that they are mainly operated from a commercial standpoint or are attended with any degree of scandal. In the absence of such knowledge, we cannot say that the exemption of them from the provisions of the act in question does not have a real and substantial relation to the public welfare. As in the Otis & Gasman Case the California statute prohibiting the sales of shares of corporate stock on margin and of no other articles was upheld on the ground that probably the evil sought to be stopped was in California confined in the main to such sales, so here we cannot say that it is not possible that the evil that is affected by the act in question is not confined in the main to the running race track. To say the very least, therefore, it is not palpably clear that this classification feature of the act does not have real and substantial relation to the public welfare.

It must be held, therefore, that in neither particular as to which complaint is made is said act in violation of the fourteenth amendment. In our consideration of the question as to whether it is, we have not found it necessary to consider the reason for the commissioner's action in refusing to assign to appellee the date for which it applied. The reason assigned in the minutes of the meeting of the commission is that said dates had been previously assigned to the New Louisville Jockey Club and the Latonia Jockey Club. The reason will hardly stand criticism. The oral applications of said clubs were made at the same meeting at which appellee's written application was filed. The only ground for stating that the dates had been previously assigned was that said oral applications were first acted on and granted before appellee's application was acted on. And the appellants in their answer showed a disposition to get away from the reason they had so assigned in alleging as a reason for their action that appellee's officers had after presenting its application stated that they did not desire an assignment of the dates applied for, and that appellee was not properly equipped for having races at those dates. The evidence presented in the lower court might justify the conclusion that the true reason therefor was to prevent competition, at least, with said New Louisville

Jockey Club; and, further, that the assigning of said dates to said club and excluding of appellee therefrom was due to a preference of it over appellee, and not to any consideration relating to the public welfare, and that in making said assignments said club was given what is termed the cream of the racing season at Louisville. Possibly the preference so shown said club may find some justification in the fact that the public welfare did not figure at all in the commission's had operated its race tracks. But said preference thus shown and the fact that the public welfare did not figure at all in the commission's action in no way affects the validity of the act in question. Said act is not to be construed as authorizing the commission to act otherwise than "in the honest exercise of·a reasonable discretion," and the possibility that it may act otherwise and its action may not be reviewable does not for the reasons heretofore stated call for the overthrow of any of its provisions.

The claim set ´forth in the bill that it is in violation of the tenth section of the first article of the federal Constitution is not insisted on here, and no point seems to have been made of it below. So no further reference need be made to it.

As to the wisdom of the enactment of said legislation or of any of its details it is not for us to say. We are concerned only with the question as to whether it is in violation of the federal Constitution.

Then as to the second provision of the order appealed from: That, as heretofore stated, presupposes that said act is constitutional, and that appellee needs a license in order to operate its race track lawfully. It in effect commands the appellants to grant it a license. Appellee maintains that it was entitled thereto because the right of review conferred by the act is such a right as it had a right to assert, and the action sought to be reviewed was in violation of the federal Constitution. We do not find it necessary to take. issue here as to either position taken. Assuming for the sake of the argument that both are correct, still appellee was not entitled to said provision of the order. This is so for several reasons. In the first place, if appellee was entitled to a license at all, it was not entitled to as broad a one as that which the appellants by said provision were so commanded to issue. The only grounds upon which it can be said that it was entitled to such a broad license are that the act did not empower the commission to assign dates or in so far it was unconstitutional. But we have already reached the conclusion that neither ground•is maintainable. Then, again, the commission has never refused to issue the appellee a license, and no showing has been made that if applied to therefor it would refuse to grant it. Appellee has never applied for a license, and hence the commissioner has never had an opportunity to refuse to grant it. The only thing that it has applied for is an assignment of particular dates. If that application is to be treated as in effect an application for a license also, the refusal to assign dates applied for was not a refusal to grant a license, and it cannot be so treated.

And, finally, the suit below was against the appellants in their individual, and not in their official, capacity. It was in their official

capacity only that they had power to grant a license or to take any other action under the act.

The fact that this court has no jurisdiction of an appeal from the final decree in said suit is no reason for dealing with this appeal in any manner different from which it would be dealt with if it had jurisdiction thereof; and this case comes within the rule recognized in the case of Louisville Home Tel. Co. v. Cumberland Tel. & Tel. Co., 111 Fed. 663, 49 C. C. A. 524, for reversing an order granting a preliminary injunction.

The order appealed from is therefore reversed, and the case remanded for further proceedings consistent herewith.